[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 15, 2012
JOHN LEY
CLERK

_____

No. 10-10960
_____

D.C. Docket No. 3:08-cv-00645-TJC-TEM

AMERISURE MUTUAL INSURANCE COMPANY,
a foreign corporation,
AMERISURE INSURANCE COMPANY,
a foreign corporation,

Plaintiffs - Appellees,

versus

AUCHTER COMPANY,
a Florida corporation,

Defendant,

AMELIA ISLAND COMPANY,
a Florida corporation,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 15, 2012)

Before TJOFLAT, CARNES and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

This insurance coverage dispute requires us to determine, under Florida law, what constitutes "property damage" under a post-1986 standard form commercial general liability ("CGL") policy with products-completed operations hazard ("PCOH") coverage. Specifically, we must decide whether such a policy issued to a general contractor provides coverage when a claim is made against the contractor for damage to the part of the completed project performed by a subcontractor, but not to any other project component, caused by a subcontractor's defective work.

The district court, ruling on cross-motions for summary judgment, held that the damage at issue was not covered under the policy, granted the insurer's motion, and entered a declaratory judgment for the insurer.[1] The insurer's adversary now appeals. In light of Florida precedent addressing the scope of similar CGL policies, we conclude that the policy provides no coverage in this case. We therefore affirm the district court.[2]

_____

[1] The district court exercised its diversity jurisdiction over the controversy pursuant to 28 U.S.C. § 1332.

[2] We review the district court's grant of summary judgment de novo. Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). We have jurisdiction over the appeal of the district court's final judgment under 28 U.S.C. § 1291. As all parties have

I.

A.

1.

On April 17, 1997, the Amelia Island Company ("Amelia") entered into a contract with the Auchter Company ("Auchter"), a general contractor, for the construction of an inn and conference center (the "Inn") on Amelia's property in Nassau County, Florida.[3] Auchter entered into a subcontract agreement with Register Contracting Company ("Register") to install the Inn's roof. Amelia did not require Auchter to obtain a performance bond to cover Auchter's contractual obligations.

The Inn would be constructed with a barrel tile roof. This roof was made from concrete, S-shaped tiles installed in an interlocking fashion and in overlapping rows. The tiles were to be installed by screwing them to the roofing substrate, which provides the roof's water resistance. Each tile contains two screw holes and the installer must fasten one screw through each hole to prevent pivoting. Moreover, each screw must be fastened at a precise tightness: if the

_____

acknowledged, Florida law governs this dispute.

[3] Along with the inn and conference center, the $26,572,363.49 standard form construction contract that Amelia and Auchter executed provided for the construction of various additional buildings on Amelia's property. These other buildings are not relevant to this case.

screw is too tight, the tile will crack; too loose and the tile can be unfastened or cracked by the upward force of the wind. The specific requirements of installation were to be according to the Florida Building Code, which dictated, in part, that the roof had to be resistant to 110 m.p.h. winds. Auchter hired Register to install the entire roof—including the roofing substrate system and the roofing tiles—at the Inn.

The contract gave Amelia the option to pay Auchter for some of the building materials used on, but not yet incorporated into, the project. These materials included the concrete roof tiles, which were delivered to and stored at the construction site before Register began installing them. On October 6, 1997, Auchter submitted a payment application to Amelia requesting payment for the Inn's roof tiles stored on site. Amelia paid Auchter for the roof tiles on October 31, 1997, at which point Amelia took ownership of the tiles under the contract.[4] During September and October 1997, Register installed the roof's substrate in preparation for installing the roof tiles. Register then began installing the roof tiles in November 1997, completing work on the Inn's roof in January 1998.

---

[4] Amelia disputes a statement in the district court's order that "[t]he contract provided that Auchter would . . . store and insure all materials and labor for the completed project." Order at 11, Amerisure Mut. Ins. Co. v. Auchter Co., No. 3:08-cv-645-J-32HTS (M.D. Fla. Feb. 4, 2010). This purported discrepancy, however, is immaterial to the present dispute. The undisputed record shows that the tiles at issue in this case were delivered to Amelia's property, were paid for by Amelia, and were then installed by Register.

Beginning in August 2002, the concrete tiles on the Inn's roof began dislodging from the roof. Amelia contacted Auchter to make repairs. On two occasions—August 18, 2002, and April 4, 2003—roofers conducted temporary repairs on the affected areas. During the 2004 hurricane season, however, Hurricanes Frances, Ivan, and Jeanne skirted the Amelia Island area, causing even more tiles to come off the roof. Some of these tiles hit other tiles on the roof, cracking them. Although the exact number of tiles lost during this time is unknown, Amelia's counsel has suggested the number exceeds 25 percent. Amelia then contracted for additional temporary repairs to remedy the tile losses. Between 2002 and 2008, Amelia paid $78,007.56 to various contractors to rectify the roof's failure. In response to these expenses, Amelia contacted Auchter, arguing that Auchter was liable for the repairs. Auchter and Amelia were unable, however, to agree regarding the cause of the roof's failure.

In 2006, pursuant to the arbitration clause in Amelia's contract with Auchter,[5] Amelia filed a demand for arbitration. Amelia claimed that Auchter was

[5] The relevant arbitration clause, General Condition 4.5.1, provides:

Any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof[.]

liable to Amelia for over $2 million in damages for defectively installing the roof. Amelia alleged that Auchter breached its contractual and legal obligations to Amelia to perform its work in a good and workmanlike manner. Although Amelia asserted that the failed roof was aesthetically deficient and dangerous to persons and property, Amelia did not allege that falling roof tiles damaged any other property or part of the project. Nor did Amelia allege that the loss of tiles had caused the roof to fail in such a way as to allow the elements to damage other components of the project. Amelia did allege, however, that it would suffer lost profits because the Inn would be unusable during the course of roof repairs.

Amerisure Mutual Insurance Company and Amerisure Insurance Company ("Amerisure") had issued successive CGL and umbrella liability ("UL") policies to Auchter for coverage between May 2002 and January 2006.[6] Amerisure defended Auchter in the arbitration proceedings under a reservation of rights. On June 25, 2008, Amerisure filed a declaratory judgment action in the United States District Court for the Middle District of Florida seeking a declaration that Amelia's claim against Auchter was not covered by the insurance policies Amerisure issued to Auchter. Specifically, Amerisure argued that Amelia's claim

---

[6] The provisions of these policies relevant to the present dispute are provided in part I.A.2, infra.

against Auchter was not for "property damage" as required to trigger coverage under the policies. If the district court granted Amerisure's requested relief, Amerisure would have no duty to indemnify or defend Auchter in its dispute with Amelia.

While the declaratory judgment action was pending, the arbitration between Amelia and Auchter took place. The arbitrator[7] conducted a two-day hearing at which counsel for Amelia and Auchter made appearances.[8] The arbitrator found Auchter liable to Amelia for $2,167,313.67 in damages for the defective installation of the roof, which constituted a breach of Auchter's contract with Amelia. Specifically, the arbitrator found that

> the requirement of compliance with the 110 mile an hour wind velocity was a condition of the contract and that the failure itself combined with other evidence such as missing screws and excessively loose tiles constitute [proof] by a preponderance of [the] evidence that the roof was not installed in accordance with contract requirements.

Appellees' Br. app. 3, at 4 (citing Cmty. Television Servs., Inc. v. Dresser Indus., Inc., 586 F.2d 637 (8th Cir. 1978)).

_____

[7] The arbitration clause in the construction contract provided for arbitration before a panel of three arbitrators. Amelia and Auchter, however, stipulated that the arbitration would be heard instead by a single arbitrator.

[8] Amerisure was not a party to the arbitration. Amerisure sent a representative to the arbitration proceedings but the representative did not participate in the arbitration.

The amount of damages was supported, in part, by evidence that the entire roof had to be replaced. For one, the roof design did not permit inspection and replacement of defectively installed tiles on an individual basis. Individual replacement was impossible because "in order to determine whether all tiles have been properly nailed or screwed down, it would be required to remove the tiles in the next tier, in essence requiring removal of the entire roof." Id. at 5. Moreover, tiles identical to those used on the Inn's roof were unavailable.

Amelia then demanded payment of the award. Auchter, however, made no payment.[9] On August 7, 2009, Amelia converted the arbitrator's award to a final judgment against Auchter in state court. This judgment includes the full amount awarded by the arbitrator plus interest and fees. Thus, Amelia has a state court judgment in hand that it is prepared to execute, but has not yet executed against any party.

2.

We return briefly to the insurance policies at issue in Amerisure's declaratory judgment action. Amerisure insured Auchter between May 1, 2002, and January 1, 2006, through a series of CGL and UL policies. In all, Amerisure

---

[9] The record before us indicates that at some point before the arbitration finished, Auchter ceased doing business.

issued three CGL policies and three UL policies with coverage effective during this period. For the present case, however, only two policies are relevant: the CGL and UL policies in effect in August 2002—the approximate time the Inn's roof began to fail.[10] Nevertheless, all the CGLs are standard form Insurance Services Office ("ISO") policies.[11] The operative policy language is thus identical for each of Amerisure's CGLs issued for coverage between 2002 and 2006.

The CGL policy provides, in relevant part, "[Amerisure] will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies. . . . This insurance applies to . . . 'property damage' only if . . . the 'property damage' is caused by an 'occurrence[.]'" The CGL defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property. . . . or . . . [l]oss of use of tangible property that is not physically injured." An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

---

[10] Those policies are CGL policy CPP 1156636090002, effective May 1, 2002, to May 1, 2003, and UL policy CUF-1319343, effective May 1, 2002, to May 1, 2003.

[11] As the Florida Supreme Court has explained, the ISO is "an industry organization that promulgates various standard insurance policies that are utilized by insurers throughout the country, including the standard CGL policy at issue in this case." U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 879 n.6 (Fla. 2007) (citing Hartford Fire Ins. Co. v. California, 509 U.S. 764, 772, 113 S. Ct. 2891, 2896, 125 L. Ed. 2d 612 (1993)).

After this general grant of coverage, the GCL excludes certain losses:

j. "Property damage" to:

. . . .

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

. . . .

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

. . . .

*l.* "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

Exclusion (*l*) is known as the "your work" exclusion. See, e.g., U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 879 (Fla. 2007). The exception to the "your work" exclusion is known as the subcontractor exception. See id.

10

The Amerisure CGL policy issued to Auchter also included PCOH coverage. PCOH is defined under the policy as follows:

[PCOH] [i]ncludes all . . . "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The UL provides coverage under the following provision: "[Amerisure] will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as damages which exceed the limit of 'underlying liability insurance' . . .

because of . . . 'property damage' . . . caused by an 'occurrence' to which this insurance applies." The CGL is the "underlying liability insurance" for the UL. The UL covers the same "property damage" as the CGL. Coverage under the UL, therefore, depends on the existence of coverage under the CGL. In effect, without "property damage" as covered by the CGL, there is no coverage under the UL.

3.

The insurance coverage discussed in the previous subsection lays the foundation for the arguments in the declaratory judgment action. Amerisure moved for summary judgment, seeking a declaration of no coverage for the arbitrator's award—enforceable through the state court judgment—under Amerisure's policies, on the ground that none of the arbitration damages awarded to Amelia constitute "property damage." Amelia filed a cross-motion for summary judgment seeking a declaration of coverage under Amerisure's policies.[12] Although named as a defendant, Auchter, which the record indicates has ceased doing business, hired no counsel and took no part in the suit.

Both Amerisure and Amelia conceded that the crux of the dispute was whether the roof had suffered "property damage." In support of its position,

---

[12] Although Amelia filed a Chapter 11 bankruptcy petition while the cross-motions for summary judgment were still pending, Amelia waived the automatic-stay benefits of 11 U.S.C. § 362(a) for purposes of litigating this dispute.

Amerisure argued that Amelia's claim was essentially one to recover the roof it had paid for but not received; any damage was limited to the roof itself. In response, Amelia argued that the plain meaning of "property damage" under the CGL imposes no requirement that "other" property be damaged to trigger coverage. Even if such a requirement existed, Amelia argued, the cracked and lost roofing tiles themselves would constitute damaged property and would be covered because no CGL exclusion applied. Amelia proposed distinguishing between construction defects like the one in this case—where a defective installation caused some physical degradation of the project component and thus constituted "property damage"—and other breaches of contract that had not physically manifested themselves in a detrimental way. The parties did not dispute that the subcontractor's installation of the roofing tiles was defective or that the defective installation constituted an "occurrence" under the CGL. It was also undisputed that the tiles themselves were nondefective.

On February 4, 2010, the district court entered its order granting Amerisure's motion for summary judgment, ruling that the damage to the roof was not "property damage," and that Amerisure thus had no continuing duty to defend or to indemnify Auchter regarding the arbitrator's award. The district court denied

13

Amelia's motion and directed the clerk of the district court to enter a declaratory judgment for Amerisure, which was entered on February 5, 2010.

B.

Along with its order, the district court issued an opinion evaluating Florida Supreme Court jurisprudence on what qualifies as "property damage" under a CGL. Relying on two cases we discuss at length in part II, infra, the district court ruled that, under Florida law, claims solely for the repair and replacement of defective work are not claims for "property damage." A claim for "property damage" requires physical injury to some tangible property other than the contractor's own defective work.

Applying these principles, the district court found that Amelia's claim in the underlying arbitration did not allege property damage. The amounts Amelia sought were solely for the repair and replacement of the entire roof. Amelia never alleged that the defective installation caused damage to any other component of the project but the roof. The district court rejected as irrelevant Amelia's argument that the roofing damage was "property damage" because Amelia owned the tiles at the time of installation. Amelia's claim was not, the court observed, for individual broken tiles, but rather to remedy the failure of the roofing system.

II.

14

We turn to Florida law to resolve this dispute. See, e.g., Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 (11th Cir. 2001) ("In rendering a decision based on state substantive law, a federal court must decide the case the way it appears the state's highest court would." (citation and internal quotation marks omitted)). The Florida Supreme Court, in two seminal cases, has opined at length regarding the scope of coverage provided by CGL policies issued to general contractors in construction-defect cases. Both Amerisure and Amelia argue that these two cases—United States Fire Insurance Co. v. J.S.U.B., Inc., 979 So. 2d 871 (Fla. 2007), and Auto-Owners Insurance Co. v. Pozzi Window Co., 984 So. 2d 1241 (Fla. 2008)—control the outcome of the present litigation. We agree with Amerisure that J.S.U.B. and Pozzi establish that a claim like that in the present case is not a claim for "property damage" covered by CGL policies. Because the present case involves no "property damage," we need not examine the scope of the exclusions to Auchter's CGL policies.

A.

In J.S.U.B., a general contractor engaged in home construction purchased a CGL policy with PCOH coverage that was, for our purposes, identical to the policy Amerisure issued to Amelia. 979 So. 2d at 875–76. After completion and delivery of the contractor's work—the completed homes—damage to the

15

foundations, drywall, and other parts of the homes appeared. Id. at 875. This damage was undisputedly caused by a subcontractor's improper soil use, compaction, and testing. Id. Pursuant to the CGL policy, the insurer paid for damage to the homeowner's personal property that resulted from the subcontractor's faulty work, but denied insurance coverage for the costs of repairing the structural damage to the homes. Id. at 876. J.S.U.B., the general contractor, filed a declaratory action to determine whether the CGL policy covered property damage to the work it contracted to perform caused by the defective work of its subcontractors. Id. The circuit court entered judgment in favor of the insurer, but the Second District Court of Appeal reversed. J.S.U.B., Inc. v. U.S. Fire Ins. Co., 906 So. 2d 303 (Fla. 2d Dist. Ct. App. 2005).

1.

The Florida Supreme Court exercised its jurisdiction[13] to address "whether a post-1986 standard form commercial general liability (CGL) policy with products-

---

[13] The Florida Constitution authorizes the supreme court to "review any decision of a district court of appeal . . . that expressly and directly conflicts with a decision of another district court of appeal . . . on the same question of law." Fla. Const. art. V, § 3(b)(3).

The Second District Court of Appeal's decision in J.S.U.B., Inc. v. United States Fire Ins. Co., 906 So. 2d 303 (Fla. 2d Dist. Ct. App. 2005), conflicted directly with the Fourth District Court of Appeal's holding in Lassiter Construction Co. v. American States Insurance Co., 699 So. 2d 768 (Fla. 4th Dist. Ct. App. 1997), which found that a post-1986 CGL policy did not cover damage to the general contractor's work caused by a subcontractor's defective construction.

16

completed operations hazard coverage, issued to a general contractor, provides coverage when a claim is made against the contractor for damage to the completed project caused by a subcontractor's defective work." J.S.U.B., 979 So. 2d at 874–75. The supreme court ultimately "answer[ed] this question in the affirmative." Id. at 875. The J.S.U.B. court began its analysis, however, by stating the rules of construction for interpreting insurance contracts, which also guide our analysis today. Under Florida law, insurance contracts are "construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage." Id. at 877 (citing Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005)). Further, a court construing an insurance policy should interpret the policy as a whole, "endeavoring to give every provision its full meaning and operative effect." Id. (quoting Auto-Owners Ins. Co. v Anderson, 756 So. 2d 29, 34 (Fla. 2000)). Accordingly, the "pertinent provisions" of the insurance contract should be read in pari materia. Id. (quoting State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1075 (Fla. 1998)). Exclusionary clauses, however, "cannot be relied upon to create coverage" through principles of contract interpretation where otherwise there is none. Id. (quoting CTC Dev., 720 So. 2d at 1074).

The supreme court then discussed the origin and evolution of the standard form CGL policy. Significantly, the court addressed the ISO's 1986 addition of exclusion (*l*), the "your work" exclusion, as well as the subcontractor exception to the "your work" exclusion. Explaining these additions to the standard form policy, the court stated:

> [T]he insurance and policyholder communities agreed that the CGL policy should provide coverage for defective construction claims so long as the allegedly defective work had been performed by a subcontractor rather than the policyholder itself. This resulted both because of the demands of the policyholder community (which wanted this sort of coverage) and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage.

Id. at 879 (alteration in original) (quoting 2 Jeffrey W. Stempel, Stempel on Insurance Contracts § 14.13[D], at 14-224.8 (3d ed. Supp. 2007)). Further, the court quoted a circular promulgated by the ISO that "confirm[s] that the 1986 revisions to the standard CGL policy . . . specifically 'cover[ed] damage caused by faulty workmanship to other parts of work in progress; and damage to, or caused by, a subcontractor's work after the insured's operations are completed.'" Id. (quoting Insurance Services Office Circular, Commercial General Liability Program Instructions Pamphlet, No. GL-86-204 (July 15, 1986)).

Because the policy in J.S.U.B. was a post-1986 CGL policy, the court had to first determine whether pre-1986 Florida Supreme Court construction-defect jurisprudence was controlling precedent. The leading case in that respect was LaMarche v. Shelby Mutual Insurance Co., 390 So. 2d 325 (Fla. 1980). LaMarche was "generally cited to support the proposition that CGL policies do not provide coverage for damage to the contractor's work caused by faulty workmanship." J.S.U.B., 979 So. 2d at 880. The J.S.U.B. court, however, rejected LaMarche as binding precedent because the LaMarche court based its holding on pre-1986 exclusionary language. Id. at 881 (citing LaMarche, 390 So. 2d at 326).[14] Moreover, LaMarche was factually distinguishable from J.S.U.B.: "LaMarche

---

[14] The relevant pre-1986 exclusionary language was standard language in post-1973 CGL policies. Coverage did not apply

> (a) to liability assumed by the insured under any contract or agreement except as an incidental contract; but this exclusion does not apply to a warrant[y] of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;
>
> (n) to property damage to the named insured's products arising out of such products or any part of such products; [or]
>
> (o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith[.]

J.S.U.B., 979 So. 2d at 880 (quoting LaMarche, 390 So. 2d at 326) (first and third alterations in original). The J.S.U.B. court noted additionally that LaMarche adopted the holding of Weedo v. Stone-E-Brick, Inc., 405 A.2d 788 (N.J. 1979), which was based on the same policy language as that in LaMarche. J.S.U.B., 979 So. 2d at 881 (citing LaMarche, 390 So. 2d at 326–27).

involved a claim of faulty workmanship by the contractor, rather than a claim of faulty workmanship by the subcontractor." J.S.U.B., 979 So. 2d at 882. The Florida Supreme Court thus determined that LaMarche did not control on the issue of "whether a subcontractor's faulty workmanship is covered in a post-1986 CGL policy." Id. at 883.

2.

Because LaMarche was not dispositive, the Florida Supreme Court had to analyze whether the claim against J.S.U.B. was covered by the CGL. The court began by addressing the "threshold issue" of "whether a subcontractor's defective work can constitute an 'occurrence.'"[15] Id. at 880. Well-settled Florida insurance jurisprudence held that when a CGL policy defines an "occurrence" as an "accident," the policy "provide[s] coverage not only for accidental events, but also injuries or damage neither expected nor intended from the standpoint of the

---

[15] We need not belabor this discussion; the parties to this case do not dispute that there was an "occurrence" within the coverage period, and instead focus their arguments on the existence of "property damage." We do the same.

It is worth noting, however, that the Florida Supreme Court declined to "make the definition of 'occurrence' depend[] on which property was damaged," J.S.U.B., 979 So. 2d at 883, and rejected drawing a distinction between tort and contract claims, where faulty construction causing a tort would constitute an "occurrence," but such construction causing a breach of contract would not, id. at 884 ("If [the insurer] intended to preclude coverage based on the cause of action asserted, it was incumbent on [the insurer] to include clear language to accomplish this result." (citation omitted)). In declining to endorse a line of demarcation between tort and contract claims, the court noted that there exists a breach-of-contract endorsement that was not present in the CGL policy at issue in the case. Id. at 884.

insured." Id. at 883 (quoting CTC Dev., 720 So. 2d at 1076 (internal quotation marks omitted)).  The bulk of the insurer's argument in J.S.U.B. was thus that defective workmanship in breach of contract could never give rise to covered claims because damage could be expected from the breach.  Id. at 883–85.

The supreme court, however, rejected the insurer's argument.  The court specifically repudiated the proposition that a breach of contract could never give rise to a covered "occurrence" within the meaning of the CGL's coverage-granting provision.  Id. at 885 (citing Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d 302, 307 (Tenn. 2007); Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W.2d 65, 76 (Wis. 2004)).  Such a definition of "occurrence" would, in large part, render the "your work" exclusion meaningless, for "if the insuring provisions do not confer an initial grant of coverage for faulty workmanship, there would be no reason for [the insurer] to exclude damage to 'your work.'"  Id. at 886.  Nor would there be a need for the subcontractor exception to the "your work" exclusion.  Id. at 887.  Extending CTC Development, the court held instead that "faulty workmanship that is neither intended nor expected from the standpoint of the contractor can constitute an 'accident' and, thus, an 'occurrence' under a post-1986 CGL policy."  Id. at 888.  Because J.S.U.B. did not expect or intend its

subcontractor's faulty work, the defective soil preparation was an "occurrence." Id.

The supreme court also explained that allowing claims arising from faulty workmanship would not convert CGLs to performance bonds. Id. at 887–88. Performance bonds, explained the court, protect a project's owner—not its contractor—by guaranteeing the project's completion after the contractor defaults. Id. at 887 (citing Am. Home Assur. Co. v. Larkin Gen. Hosp., Ltd., 593 So. 2d 195, 198 (Fla. 1992); Sch. Bd. of Palm Beach Cnty. v. Vincent J. Fasano, Inc., 417 So. 2d 1063, 1065 (Fla. 4th Dist. Ct. App. 1982)). A performance bond does not protect the contractor or his subcontractor from liability. Id. at 888 (citing Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co., 189 F. Supp. 2d 1212, 1218 (D. Kan. 2002)). The CGL insurer, by contrast, "indemnifies the insured," and does so "only for resulting 'property damage' arising after the project is completed." Id. (quoting Lennar Corp. v. Great Am. Ins. Co., 200 S.W.3d 651, 674 (Tex. App. 2006)) (internal quotation marks omitted). Because of this distinction, "a variety of deficiencies that do not constitute 'property damage' may be covered by a performance bond, and not all deficiencies cause additional property damage." Id. (quoting Lennar Corp., 200 S.W.3d at 674) (internal quotation marks omitted). The supreme court was thus satisfied that CGLs would not become performance

22

bonds by recognizing that construction defects could give rise to covered claims.

Id.

3.

Having determined that a subcontractor's faulty workmanship could give rise to an occurrence, the supreme court turned to whether the subcontractor's faulty soil work had caused "property damage" within the meaning of the CGL. As an initial matter, the court summarized,

> [The insurer] and the amici that argue in favor of its position assert that faulty workmanship that injures only the work product itself does not result in "property damage." However, just like the definition of the term "occurrence," the definition of "property damage" in the CGL policies does not differentiate between damage to the contractor's work and damage to other property.

Id. at 889.

The court rejected the insurer's contention that a subcontractor's defective work "rendered the entire project damaged from its inception." Id. Instead, the court drew the following distinction:

> [F]aulty workmanship or defective work that has damaged the otherwise nondefective completed project has caused "physical injury to tangible property" within the plain meaning of the definition in the policy. If there is no damage beyond the faulty workmanship or defective work, then there may be no resulting "property damage."

Id.

23

In so holding, the supreme court cited a long list of cases from Florida and other jurisdictions recognizing this distinction. Claims solely for "the costs of repairing and replacing the actual defects in . . . construction" are not covered under CGL policies. Id. at 889–90 (citing Cincinnati Ins. Co. v. Venetian Terrazzo, Inc., 198 F. Supp. 2d 1074, 1079 n.1 (E.D. Mo. 2001); W. Orange Lumber Co. v. Ind. Lumbermens Mut. Ins. Co., 898 So. 2d 1147, 1148 (Fla. 5th Dist. Ct. App. 2005); Auto Owners Ins. Co. v. Tripp Constr., Inc., 737 So. 2d 600, 601 (Fla. 3d Dist. Ct. App. 1999); Moore & Assocs., 216 S.W.3d at 310; Lennar Corp., 200 S.W.3d at 679–80). In West Orange Lumber, for example, the cost of removing and replacing cedar siding of the wrong grade, installed in breach of contract, was not "property damage." 898 So. 2d at 1148; see also Lennar Corp., 200 S.W.3d at 679–80 (holding that the cost of removing and replacing defective synthetic stucco to preempt water damage to buildings was not "property damage"). In Moore & Associates, on the other hand, a subcontractor's defective window installation caused "property damage" because the defective installation allowed water penetration that damaged the windows' surroundings. 216 S.W.3d at 310.

The supreme court reasoned that the claim in J.S.U.B. was more like that in Moore & Associates than those in West Orange Lumber and Lennar. "[J.S.U.B.]

24

does not involve a claim for the cost of repairing the subcontractor's defective work"—the soil preparation itself—"but rather a claim for repairing the structural damage to the completed homes caused by the subcontractor's defective work." J.S.U.B., 979 So. 2d at 890.

> Accordingly, we hold that a post-1986 standard form commercial general liability policy with products completed-operations hazard coverage, issued to a general contractor, provides coverage for a claim made against the contractor for damage to the completed project caused by a subcontractor's defective work provided that there is no specific exclusion that otherwise excludes coverage.

Id. at 891. Finding no CGL exclusion applicable, the court held that the structural damage to the homes J.S.U.B. built was covered by its insurance policies. Id.

B.

Another case from the Florida Supreme Court, Auto-Owners Insurance Co. v. Pozzi Window Co., 984 So. 2d 1241 (Fla. 2008), sheds light upon the scope of "property damage" within the meaning of CGL policies with PCOH coverage. In Pozzi, a subcontractor defectively installed custom windows into a multimillion-dollar home. Id. at 1243. After completion of the home, the owner complained of water leakage around the windows, which had caused damage to the areas of the home surrounding the windows, as well as to the windows themselves. Id. at

25

1244. The homeowner filed suit against the builder and the subcontractor, along with the manufacturer and retailer of the windows. Id. at 1243.

The manufacturer of the windows, the Pozzi Window Company, settled with the homeowner and agreed to remedy the defective installation of the windows. Id. at 1243–44. The manufacturer also settled with the builder, and, as the assignee of the builder, filed suit against the builder's insurer seeking coverage for the repair and replacement of the windows.[16] The builder's insurance policy was, for our purposes, identical to the policy held by Amelia in the present litigation—i.e., a CGL policy with PCOH coverage.

The case reached this court, which certified the following question to the Florida Supreme Court:

> DOES A STANDARD FORM [COMMERCIAL] GENERAL LIABILITY POLICY WITH PRODUCT[S] COMPLETED OPERATIONS HAZARD COVERAGE, SUCH AS THE POLICIES DESCRIBED HERE, ISSUED TO A GENERAL CONTRACTOR, COVER THE GENERAL CONTRACTOR'S LIABILITY TO A THIRD PARTY FOR THE COSTS OF REPAIR OR REPLACEMENT OF DEFECTIVE WORK BY ITS SUBCONTRACTOR?

---

[16] The only issue in the suit between the manufacturer and insurer was whether the insurer was obligated to pay for the repair and replacement of the damaged windows; the insurer had already paid "for personal property damage caused by the leaking windows, but refused to provide coverage for the cost of repair or replacement of the windows." Auto-Owners Ins. Co. v. Pozzi Window Co., 984 So. 2d 1241, 1244 (Fla. 2008).

26

Id. at 1243 (quoting <u>Pozzi Window Co. v. Auto-Owners Ins. Co.</u>, 446 F.3d 1178, 1188 (11th Cir. 2006)) (alteration in original).[17]

In answering this question, the Florida Supreme Court first reiterated <u>J.S.U.B.</u>'s pronouncement on property damage. Namely, "there is a difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" <u>Id.</u> at 1248 (quoting <u>J.S.U.B.</u>, 979 So. 2d at 889) (internal quotation marks omitted). In so explaining, the court cited <u>West Orange Lumber</u>, the cedar-siding case discussed <u>supra</u>, for the proposition that there is no property damage "when the only damage alleged was the cost of removing and replacing the wrong grade cedar siding that had been installed" because "[t]here was no damage to the construction itself." <u>Id.</u> (citing <u>W. Orange Lumber</u>, 898 So. 2d at 1148). "[T]he mere inclusion of a defective component, such as a defective window or the defective installation of a window, does not constitute property damage unless that defective component

_____

[17] As the Florida Supreme Court noted,

[w]hen the Eleventh Circuit certified the question, it did not have the benefit of our decision in <u>United States Fire Ins. Co. v. J.S.U.B., Inc.</u>, 979 So. 2d 871 (Fla. 2007), in which we held that a subcontractor's defective work can constitute an "occurrence" under a post-1986 standard form general commercial liability policy.

<u>Pozzi</u>, 984 So. 2d at 1243.

27

results in physical injury to some other tangible property." Id. Thus, the supreme court determined that the answer to the certified question was dependent on a critical factual determination: "whether the windows themselves were defective or whether the faulty installation by the Subcontractor caused damage to both the windows and other portions of the completed project." Id. at 1247.

If the windows contracted for were defective prior to installation, then the damage to the windows would not be covered. Id. at 1248. In that case, the claim would be "merely a claim to replace a 'defective component' in the project" and could not, in and of itself, constitute property damage. Id. Moreover,

> the mere inclusion of a defective component, such as a defective window or the defective installation of a window, does not constitute property damage unless that defective component results in physical injury to some other tangible property.

Id.; see also id. at 1249 ("Without more, this alleged defect[ive] [installation] is the equivalent of the 'mere inclusion of a defective component' such as the installation of a defective tire [on a car], and no 'property damage' has occurred." (quoting Moore & Assocs., 216 S.W.3d at 310) (emphasis omitted)).

On the other hand,

> [i]f the windows were purchased by the Homeowner and were not defective before being installed, coverage would exist for the cost of repair or replacement of the windows because there is physical injury

28

to tangible property (the windows) caused by defective installation by a subcontractor.

Id. at 1248. The damage to the windows themselves would be "property damage" in this situation "because the windows were purchased separately by the Homeowner, were not themselves defective, and were damaged as a result of the faulty installation." Id. at 1249. The damage to the windows themselves would thus be "similar to damage to any other personal item of the Homeowner, such as wallpaper or furniture." Id.[18]

## C.

Ultimately, we hold that the Florida Supreme Court has drawn a distinction between "a claim for the cost of repairing the subcontractor's defective work," which is not covered under a CGL policy, and "a claim for repairing the structural damage to the completed [project] caused by the subcontractor's defective work," which is covered. J.S.U.B., 979 So. 2d at 890. "A claim limited to faulty workmanship or materials," as the J.S.U.B. court illustrated, "is one in which the sole damages are for replacement of a defective component or correction of faulty installation." Id. at 889–90 (quoting Moore & Assocs., 216 S.W.3d at 310

---

[18] With the certified question answered, we held that the damage to the windows was covered because Pozzi never argued that the windows themselves were defective. Pozzi Window Co. v. Auto-Owners Ins., 294 F. App'x 588, 591 (11th Cir. 2008).

29

(internal quotation marks omitted) (alteration omitted)).  Because of this principle, there is no coverage "[i]f there is no damage beyond the faulty workmanship," i.e., unless the faulty workmanship has damaged some "otherwise nondefective" component of the project.  Id. at 889.  Moreover, if a subcontractor is hired to install a project component and, by virtue of his faulty workmanship, installs a defective component, then the cost to repair and replace the defective component is not "property damage."  Pozzi Window, 984 So. 2d at 1248.  Similarly, nondefective and properly installed raw materials can constitute a defective project component when the contract specifications call for the use of different materials, yet the cost to reinstall the correct materials is not "property damage"—even though the remedy for such a nonconformity is to remove and replace that component of the project.  Id. (citing W. Orange Lumber, 898 So. 2d at 1148).  In other words, "unless th[e] defective component results in physical injury to some other tangible property," i.e., other than to the component itself, there is no coverage.  Id. (emphasis added).

III.

We now apply the CGL language and the Florida law distilled above to the present dispute.  Amelia's claim against Auchter for the Inn's defective roof is not a claim for "property damage" within the plain wording of the CGL policy issued

30

to Auchter by Amerisure. Register's defective installation of the Inn's roof did not cause "physical injury to tangible property" as required to trigger coverage under the CGL. Because there is no coverage, Amerisure has no duty to indemnify or defend Auchter against Amelia's execution of the state court judgment enforcing the arbitrator's award.

In its arbitration pleadings, Amelia alleged that "the concrete tile roof system for the Inn and Conference Center began to fail, resulting in large, concrete tiles falling from the top of the Inn and Conference Center, with resulting aesthetic deficiencies and danger to persons and property." Record, vol. 4, no. 43-5, at 4. Amelia claimed that Auchter's roof was in breach of the construction contract. Regarding damages, Amelia contended that "Auchter, through its subcontractor, installed roofs in a defective manner resulting in damage to the Inn roof and the need to replace the entire roof system at the Inn and Conference Center." Id. vol. 2, no. 34, app. B, at 3. The arbitration award reflects that full replacement was necessary because repairing the roof piecemeal was impossible. Appellees' Br. app. 3, at 5. Amelia has never alleged that any part of the Inn other than the roof was damaged by the defective roof.

The only damages Amelia alleges are those to correct the faulty roof supplied by Auchter's subcontractor. In so claiming, Amelia is effectively seeking

to secure the roof that Auchter should have installed in the first instance: one that conformed with the contract specifications. Amelia's claim is thus simply a "claim for the cost of repairing the subcontractor's defective work." U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 890 (Fla. 2007). As such, Amelia's claim alleges no "property damage." See id. Although the loss of roof tiles may be said to have "damaged" the structural integrity of the roof, thereby rendering it defective, "there is no damage beyond the faulty workmanship" because the defective roof has not damaged some "otherwise nondefective" component of the project. See id. at 889. This case is like West Orange Lumber Co. v. Indiana Lumbermens Mutual Insurance Co., 898 So. 2d 1147, 1148 (Fla. 5th Dist. Ct. App. 2005), cited with approval in J.S.U.B., 979 So. 2d at 889, and in Auto-Owners Insurance Co. v. Pozzi Window Co., 984 So. 2d 1241, 1248 (Fla. 2008), where the cost of removing and replacing siding shingles—which were tiled in an overlapping, interlocking manner—was not property damage even though the defect necessitated a total replacement. See W. Orange Lumber, 898 So. 2d at 1148. The outcome is no different where, as here, the tiles are installed atop a

building rather than on its faces. Amerisure's CGL policy thus does not cover Amelia's claim.[19]

Moreover, Amelia's claim all along has been solely to remedy the installation of a defective component, which in this case is the roof <u>as a whole</u>. Because the Inn's roof was an amalgamation of scores of interlocking roofing tiles and other roofing materials, the roofing tiles themselves are not the relevant components in this case. They are simply some of the raw materials from which this particular roof was made. Rather, the relevant component in this case is the Inn's entire roof itself. Amelia hired Auchter to provide an Inn with a roof; Auchter hired Register to construct that roof—not simply to install tiles. The

---

[19] The CGL contains language that, taken in isolation, superficially suggests coverage for the roof in this case. The policy provides coverage for "tangible property" that "suffers physical injury," unless a policy exclusion applies. The roof here is "tangible," perhaps as opposed to intangible. And the roof is "property": Amelia owned it, the tiles from which it is made, the building upon which it rests, and the land upon which that building sits. Also, through the subcontractor's faulty installation, the roof's integrity and performance were injured, if at all, physically. There is simply no other way—emotionally or spiritually, for example—to injure a roof. The crux of Amelia's contention, then, is that a roof whose tiles have blown away is a roof lacking structural integrity, and that a roof without integrity is an injured roof. As Amelia would have it, the subcontractor whose defective installation enabled those tiles to blow away thus caused "physical" "injury" to "tangible" "property."

Combining these four words, however, does not yield coverage. Amelia's claim, in effect, reduces to the following: Amelia paid Auchter to construct a building with a roof; due to Auchter's subcontractor's faulty workmanship in installing the roof's tiles, Amelia did not receive the roof for which it paid. Based on this premise, as Amerisure argued at the summary judgment hearing, "The reason [Auchter] had to replace [the roof] is because [Amelia] didn't get what [it] paid for." Record, vol. 6, no. 66, at 14. This is not a claim for "property damage." <u>See</u> <u>J.S.U.B.</u>, 979 So. 2d at 889.

33

entire roof's faulty construction rendered the roof defective—a defect that, as the parties acknowledge, can be remedied only through total reconstruction. As Pozzi Window instructs, however, this defect alone cannot constitute property damage. See 984 So. 2d at 1248. If the defective roof had "result[ed] in physical injury to some other tangible property," id., there would have been property damage, but because Amelia seeks only to remedy the defect—in effect, to obtain the nondefective roof that should have been built in the first place—there is none, see id.

Amelia's argument that the tiles damaged by the faulty installation constitute property damage is unpersuasive. Although the tiles themselves were nondefective, they were simply the materials used to construct the defective component and are thus irrelevant to the "property damage" determination. See id. Even if the broken tiles constituted "property damage," as the district court explained, "Amelia's recovery would be limited to the damages to the individual tiles that are broken." Order at 12, Amerisure Mut. Ins. Co. v. Auchter Co., No. 3:08-cv-645-J-32HTS (M.D. Fla. Feb. 4, 2010). Of course, Amelia's claim is not for damage to individual tiles, but rather to receive the roof for which it paid. Although the arbitrator determined that replacing the roof was the only way to remedy the degradation caused by the tiles' defective installation, that

34

determination does not transform Amelia's claim into one for "property damage."[20]

Similarly, Amelia's proposed distinction between defective workmanship alone (uncovered) and defective workmanship that ultimately damages the functional integrity of the workman's product (covered) is a distinction without a difference.[21] If the alleged defect were, for example, that Register installed the

---

[20] To be clear, Pozzi Window does not compel a finding of coverage in this case on the ground that the owner-purchased roofing tiles in this case are analogous to the owner-purchased, custom-built windows in Pozzi Window. The components involved in these two cases are not analogous. A window may be a component of a building, but each window is itself composed of various elements: glazing, jambs, sills, sashes, etc. To say that nondefective but improperly installed sashes within the finished window damaged the window is not to say that the sashes caused "property damage" to the window, but rather that the window is itself defective. Pozzi Window instructs that there would be no coverage for the installation of such a defective window. See 984 So. 2d at 1248. The properly analogous description of the construction of Amelia's building is thus that nondefective but improperly installed roofing tiles within the finished roof rendered the roof defective. Just as we cannot say that the defective sashes caused "property damage" to the windows, we cannot say the tiles caused "property damage" to the roof.
    So, too, is it irrelevant that Amelia purchased the roofing tiles Register used to construct the Inn's roof. This is because the installation of a defective component—here, the roof—does not give rise to a claim for "property damage" absent damage to some property other than the component itself. See id. Again, the proper analog to Pozzi Window would be, for instance, a case in which Amelia purchased a modular prefabricated roof, which, though nondefective, was installed defectively by a subcontractor, thereby damaging the roof itself. Pozzi Window suggests that, in such a case, there would be coverage. See id. at 1249. Such facts, however, are not the facts of this case. Auchter hired Register to construct the roof component of the Inn, of Amelia's tiles, which Register did defectively and in breach of contract. This is thus a defective-component-replacement case, for which there can be no coverage under Pozzi Window and J.S.U.B.

[21] Amici provide further illustration in their brief:

Examples of 'faulty workmanship' which do not involve 'property damage[]' include, but are not limited to, use of incorrect or insufficient materials, wrong color or type of paint, failure to complete job-related tasks, and improper

35

wrong grade of tiles in breach of contract, Amelia's claimed "damage" would be the same: because of the way a roof is constructed, a new roof would have to be installed to correct such a defect. Essentially the same claim was held not to be property damage in West Orange Lumber, 898 So. 2d at 1148. The particular manifestation of the breaching defective workmanship would therefore be irrelevant, so long as it does not damage some other nondefective project component. Amelia's claim thus reduces to one where the only alleged damage is the defect itself. This damage alone is not "property damage" under the language of the CGL or Florida law. See Pozzi Window, 984 So. 2d at 1248; J.S.U.B., 979 So. at 889.[22]

installation of doors that open in the wrong direction.

Brief of Amicus Curiae Nat'l Ass'n of Home Builders, Fla. Home Builders Ass'n & United Policyholders 10.

[22] Put another way, the claim in this case would be the same if, as Amelia tries to distinguish, the tiles had been installed defectively but the defect had been discovered before tiles began blowing away. Defective installation, as the arbitrator found, meant that the tiles were prone to rotation and breakage. Because there was no way to determine which individual tiles had been improperly installed, the only way to remedy the defective installation was to remove and replace all the tiles—in effect, to install a new roof that complied with the contract specifications. Not only did each tile have to be attached to the roofing system in a precise manner, but each tile in a roof relies on its neighboring tiles to function as a cohesive system. Because of the tiles' interconnectivity, installations thereof that were in breach of contract and that would require replacing the roof would include installations that—as here—made the tiles more prone to flying off the roof. But such breaching installations would also include the installation of tiles which were of the wrong grade. In the latter case, were Amelia to insist on tiles of the grade specified in the contract, the roofing subcontractor would have to remove the nonconforming tiles and reinstall the roof with the conforming tiles. If Amelia's policy interpretation were accepted, therefore, many breaching installations of the tiles would thus

36

Because we determine that Amelia's claim involves no "property damage,"

we need not determine whether any policy exclusions or exceptions apply. Cf.

J.S.U.B., 979 So. 2d at 891 ("[A] post-1986 standard form [CGL] policy with

[PCOH] coverage . . . provides coverage for a claim made against the contractor

for damage to the completed project caused by a subcontractor's defective work

provided that there is no specific exclusion that otherwise excludes coverage.").

The application of the "your work" exclusion and its subcontractor exception thus

has no impact on the outcome of this case. We note, however, that these

provisions can be read in pari materia with the "property damage" requirement and

still be given full effect. See id. at 877. As the district court explained,

> [F]aulty workmanship to one part of a project (the roof, for example)
> can lead to damage to another part of the project (such as stucco walls
> which may leak from faulty roof construction). In such an example,
> under Auchter's CGL policies, the damage to the stucco walls would
> be "property damage" within the meaning of the policy, but would
> ordinarily be excluded under the "your work" exclusion, unless the
> stucco walls had been constructed by a subcontractor, in which case
> the damage could be covered by the subcontractor exception to the
> "your work" exclusion.

"damage" the roof by requiring reinstallation. Reinstalling roof tiles may be, as here, a very expensive proposition. A very expensive claim for repair and replacement of defective workmanship alone is not, however, a claim for property damage covered by a CGL policy.

Order at 14 n.9. Amelia, on the other hand, has never claimed such damage to any component of the Inn other than the roof itself and thus has not claimed "property damage."

Accordingly, the district court's Order granting Amerisure's motion for summary judgment and denying Amelia's motion for summary judgment is hereby AFFIRMED.

HILL, concurring dubitante:

I believe that the significant disagreement between Judges Tjoflat and Carnes regarding which case – *West Orange Lumber Co.* or *Pozzi Window Co.* – more accurately predicts what the Florida Supreme Court would hold on the facts of the instant case militates in favor of the certification of this case to that court. Unable to persuade my brothers as to this prudent court of action, I concur dubitante in the opinion of Judge Tjoflat.

CARNES, Circuit Judge, dissenting:

My colleague, Judge Hill, concurs "dubitante" in the decision of this Court affirming the judgment of the district court. By contrast, my dissent is free of dubitante-ness. I am not dubitante in the least that the Florida Supreme Court's decision in Auto-Owners Insurance Co. v. Pozzi Window Co., 984 So. 2d 1241 (Fla. 2008), dictates a decision in this case different from the one the majority reaches.

In the Pozzi Window case, the Florida Supreme Court held that coverage for the cost of repair or replacement of damaged windows depended on whether the windows were defective to begin with or were damaged because of improper installation. See id. at 1249. The court held that if the windows were not defective before being installed, the damage done to them was "property damage" for purposes of a commercial general liability insurance policy. See id. In our case, the Amelia Island Company's roof tiles were not defective to begin with but were damaged when improperly installed. Under the Pozzi Window decision, that is "property damage" covered by the Amelia Island Company's commercial general liability policy.

The windows involved in the Pozzi Window case were custom-made ones that a property owner bought directly from a retailer and had delivered to his

40

property on which a house was being constructed for him. 984 So. 2d at 1243. After a subcontractor installed the windows, water leaked in around them. See id. An insurance coverage dispute arose about the scope of "property damage," which is the same term at issue in the present case. See id. at 1244–45. The insurer refused to pay for the cost of repairing or replacing the damaged windows. Id. at 1244.

In response to a certified question from this Court, the Florida Supreme Court held that whether the cost of repairing or replacing the windows was "property damage" under the policy hinged on a crucial factual issue. See id. at 1247. That factual issue was "whether the windows themselves were defective or whether the faulty installation by the Subcontractor caused damage to both the windows and other portions of the completed project." Id. The "both . . . and" construction in that sentence might be read to imply that damage to the windows alone would not be enough to constitute property damage. But that is not an accurate reading because the "damage to . . . other portions of the completed project," id., was not at issue in Pozzi Window; it was not at issue because the insurer had already paid for the "personal property damage caused by the leaking windows." Id. at 1244. In response to our inquiry, the Florida Supreme Court addressed the question of whether the cost of repairing or replacing the damaged

windows themselves was covered. See id. at 1243–44. The answer it gave was that it depended on whether the windows were defective or damaged before being installed. If they were, there was no policy coverage; however, if they were not defective or damaged before the installation began, the policy covered the cost of repairing or replacing the windows. Id. at 1243–44.

No one has suggested that the roof tiles involved in this case were defective or damaged before the installation began. Instead, everyone agrees that the damage to the tiles occurred because the subcontractor improperly installed them. As the majority opinion explains, defective installation caused the tiles to fall off of the roof, and some of the tiles that fell hit other tiles and cracked them. Maj. Op. at 6. None of the damaged tiles could be used or re-used, so all of those tiles were effectively destroyed. Destroyed roof tiles meet the commercial general liability policy's definition of "property damage" as "[p]hysical injury to tangible property." Doc. 36-2 at § V, ¶ 17a.

The destruction of those individual tiles was not the full extent of the property damage caused by the defective installation. Because some of the tiles were destroyed, all of the tiles on the roof had to be replaced. As the majority opinion explains, "the roof design did not permit inspection and replacement of defectively installed tiles on an individual basis," and "tiles identical to those used

42

on the Inn's roof were unavailable." Maj. Op. at 9. For those reasons, under the terms of the general commercial liability insurance policy, the "property damage" that occurred as a result of the defective installation of the tiles was both the "[p]hysical injury to tangible property" (the destroyed tiles) and the "[l]oss of use of tangible property that is not physically injured" (the other tiles on the roof). Doc. 36-2 at § V, ¶¶ 17a, 17b.

Substituting roof "tiles" for "windows" in the key parts of the Florida Supreme Court's <u>Pozzi Window</u> opinion shows that there is coverage in this case: "If the [tiles] were purchased by the [Amelia Island Company] and were not defective before being installed, coverage would exist for the cost of repair or replacement of the [tiles] because there is physical injury to tangible property (the [tiles]) caused by defective installation by a subcontractor." <u>Pozzi Window</u>, 984 So. 2d at 1248.

Again, substituting "tiles" for "windows" in the <u>Pozzi Window</u> opinion shows how we should decide this case:

> [I]f the claim is for the repair or replacement of [tiles] that were not initially defective but were damaged by the defective installation, then there is physical injury to tangible property. In other words, because the [tiles] were purchased separately by [the Amelia Island Company], were not themselves defective, and were damaged as a result of the faulty installation, then there is physical injury to tangible property, i.e., [tiles] damaged by defective installation.

43

> Indeed, damage to the [tiles] themselves caused by the defective installation is similar to damage to any other personal item of the [property owner], such as wallpaper or furniture. Thus, coverage would exist for the cost of repair or replacement of the [tiles] because the Subcontractor's defective installation caused property damage.

Id. at 1249.

The majority opinion misinterprets the following sentence from the Pozzi Window opinion: "[T]he mere inclusion of a defective component, such as a defective window or the defective installation of a window, does not constitute property damage unless that defective component results in physical injury to some other tangible property." 984 So. 2d at 1248; see Maj. Op. at 28. But the sentence that immediately follows that one in the Pozzi Window opinion shows how inapplicable the statement in the first sentence is to the present case: "Accordingly, if the claim in this case is for the repair or replacement of windows that were defective both prior to installation and as installed, then that is merely a claim to replace a 'defective component' in the project." 984 So. 2d at 1248 (emphasis added). In this case, the roof tiles were not a defective component — they were not "defective both prior to installation and as installed," id.; the insured is not seeking to replace an initially defective component in the roofing project. Instead, under Pozzi Window held, because the claim in this case is for the repair or replacement of tiles "that were not initially defective but were damaged by the

defective installation, then there is physical injury to tangible property." Id. at 1249. The Pozzi Window formula is: non-defective tiles damaged by defective installation equals physical injury to tangible property, which is property damage. Fed into that formula, the facts of this case add up to "property damage" and coverage.

The majority opinion attempts to frame the roof as a whole as the "defective component" in this case. See Maj. Op. at 34, 36 n.20. But no part of the roof was ever defective except for the tiles that were damaged or destroyed because they were improperly installed. The facts of this case simply do not fit in the defective component scenario described in Pozzi Window. See 984 So. 2d at 1248. Instead, these facts fit into the non-defective component/defective installation scenario. See id. at 1249. For that reason, I would hold that the Pozzi Window decision resolves the dispute in favor of insurance coverage.

The majority opinion, however, asserts that "[t]his case is like West Orange Lumber Co. . . . where the cost of removing and replacing siding shingles—which were tiled in an overlapping, interlocking manner—was not property damage even though the defect necessitated a total replacement." Maj. Op. at 33. The majority's West Orange Lumber analogy, like any defective component, won't work. The installation of the siding shingles in that case did not damage them; the

45

shingles were already "defective" before they were installed because they did not conform to the contract specifications. See W. Orange Lumber Co. v. Ind. Lumbermens Mut. Ins. Co., 898 So. 2d 1147, 1148 (Fla. 5th DCA 2005). The subcontractor who had installed those defective shingles sued the supplier of them, and the court held that the insurance company had no duty to defend or indemnify the shingle supplier. Id. at 1147–48. The court noted: "[T]he allegations in the complaint show the owner or general contractor's property suffered no damage from the failure to supply the correct quality of [shingles]. The only damage alleged was the cost or expense to the vendor to remove the defective product and supply an acceptable substitute." Id. at 1148. The court also noted that the insurance policies in that case contained "exclusions which clearly exempt from coverage damages incurred by a vendor who supplies defective products and is required to remove and replace them with the specified products." Id. at 1149 (emphasis added).

One more time. In this case tiles, which were the correct product and were not defective, were sold to the Amelia Island Company, and then they were damaged by defective installation, and as a result of that damage all of the tiles had to be replaced. The West Orange Lumber case is different because in it the shingles were the wrong product and for that reason were defective, requiring that

46

they all the shingles be replaced even though they were installed correctly. The Florida Supreme Court's <u>Pozzi Window</u> decision is open and shut on the issue in this case, and the majority's attempt to hammer the facts of this case into the <u>West Orange Lumber</u> decision is itself an instance of defective installation. And there is no reason to be dubitante about that.