[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 19, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10559

_____

D. C. Docket No. 02-23093-CV-TK

POZZI WINDOW COMPANY,

Plaintiff-Counter-
Defendant-Appellee
Cross-Appellant,

versus

AUTO-OWNERS INSURANCE,

Defendant-Counter-
Claimant-Third Party-
Plaintiff-Appellant
Cross-Appellee,

versus

CORAL CONSTRUCTION OF SOUTH FLORIDA, INC.,
JAMES IRBY,

Third-Party-Defendants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(April 19, 2006)**

Before TJOFLAT and HULL, Circuit Judges, and RESTANI[*], Judge.

PER CURIAM:

This appeal involves an insurance coverage dispute. Appellant Auto-Owners Insurance Company ("Auto-Owners") issued to contractor Coral Construction of South Florida, Inc. ("Coral") and Coral's president, James J. Irby, two commercial general liability policies (the "Policies"). The insured Coral assigned its rights under the Policies to Pozzi Window Company ("Pozzi"), which manufactured the windows in a home that Coral constructed. The parties dispute whether the Policies cover Coral and Irby's liability for the repair or replacement of the defectively installed windows. The district court concluded that coverage existed and granted partial summary judgment in favor of Coral and Irby's assignee Pozzi and against Auto-Owners.

The case then proceeded to a jury trial before a magistrate judge on Pozzi's claims of bad faith and breach of contract against Auto-Owners. The jury found in Pozzi's favor and awarded Pozzi $500,000 in punitive damages on the bad faith claim. Thereafter, the magistrate judge granted Auto-Owners' motion for judgment as a matter of law as to the bad-faith verdict and set aside the jury's punitive-damages award.

---

[*]Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

Auto-Owners appeals the judgment in favor of Pozzi as to the coverage issues and argues that its Policies do not cover the costs of repair or replacement of defective work. After review and oral argument, we certify the coverage issue to the Florida Supreme Court. In Pozzi's cross-appeal, we affirm the magistrate judge's grant of judgment as a matter of law in favor of Auto-Owners on the bad faith and punitive damages issues.

## I. BACKGROUND

Auto-Owners issued to Coral and its president, Irby, two identical commercial general liability policies. The Policies provided a general aggregate limit of liability coverage (other than "Products-Completed Operations") of $1 million as well as a separate aggregate limit of liability coverage for "Products-Completed Operations" of $1 million.

### A. Underlying litigation

During the coverage period, Coral and Irby constructed a multi-million-dollar house for Jorge Perez in Coconut Grove, Florida. The house included windows manufactured by Pozzi and installed by Coral's subcontractor, Brian Scott Builders, Inc. ("Scott"). The windows apparently were defectively installed by Scott. After moving into the house in 1997, Perez complained of water damage to his home as a result of leakage around the windows.

Perez filed suit in state court against Pozzi, Coral, and Scott. Pozzi entered into a settlement with Perez, under which Pozzi agreed to remedy the defective installation of the windows. In the same lawsuit, Pozzi filed cross-claims against Coral for negligent supervision of Scott. Pozzi later added Irby as a defendant on its cross-claims. Coral and Irby made a claim under the Policies, and Auto-Owners asserted that the damages Pozzi was seeking were not covered.

Auto-Owners provided a defense for Coral under a reservation of rights. Auto-Owners paid Perez for his claims for personal property damage caused by leakage from the windows, and Perez released Coral and Irby from any liability. However, Auto-Owners continued to maintain that there was no coverage for the costs of repair or replacement of the windows.

Irby retained Stanley Klett as his attorney in the litigation with Pozzi. According to Irby, Auto-Owners initially refused to pay for Irby's defense. Klett scheduled a mediation for April 2002.[1] At the mediation, Auto-Owners took the position that there was no coverage. As a result, Pozzi's lawyers told Auto-Owners to "go home," and Pozzi, Coral, and Irby continued settlement talks without Auto-Owners.

---

[1]Shortly after the mediation was scheduled, Auto-Owners also brought a separate declaratory judgment action in state court seeking a determination that the Policies did not cover the repair or replacement costs. In this case, the district court denied Auto-Owners' motion to dismiss in light of that action, and Auto-Owners has not challenged that ruling in this appeal.

4

At the mediation, the parties reached an agreement in principle to settle all claims among them. Under the proposed settlement, Pozzi would recover from Coral and Irby and release its claims against them, and Coral and Irby would assign to Pozzi their insurance claims against Auto-Owners.

Just after the mediation, having been informed of the separate settlement discussions among Pozzi, Coral, and Irby, Auto-Owners had Thomas Berger, the defense lawyer it had retained for Coral, file a notice of appearance on behalf of Irby. Auto-Owners agreed to defend Irby under the same reservation of rights issued to Coral. Auto-Owners, however, continued to refuse to reimburse Klett and/or Irby for the fees Klett had incurred in representing Irby in the previous seven months. According to Irby and Klett, although Berger and Klett had communicated about the case, Irby and Klett were not informed prior to the filing of the notice of appearance that Berger would be taking over Irby's representation.

Shortly thereafter, Coral and Irby entered into a settlement with Pozzi. As part of the settlement, Pozzi, Irby, and Coral signed onto a Consent Judgment, which was entered by the state court. Under the Consent Judgment, Pozzi was entitled to recover from Coral and Irby $646,726 in principal, $163,298 in prejudgment interest, and post-judgment interest at the statutory rate. Also under the settlement, Coral and Irby assigned to Pozzi their claims against Auto-Owners

5

and their rights under the Policies.

### B. This Litigation

Pozzi then filed this lawsuit in the district court alleging that Auto-Owners breached its insurance contract by denying coverage to Coral and Irby for Pozzi's claims in the underlying litigation, refusing to defend Irby or reimburse his defense costs, and refusing to participate in the settlement (Count One). Pozzi also asserted that Auto-Owners' conduct was in bad faith (Count Two). Pozzi further asserted that, as assignee of Coral's and Irby's rights under the Policies, it was entitled to fees and costs incurred by Coral and Irby in prosecuting this action (Count Three). Auto-Owners filed a counterclaim for declaratory relief, seeking a determination that it had no duty to defend Coral and Irby and that there was no coverage under the Policies for the claims asserted in the underlying litigation.

The parties filed cross-motions for summary judgment. The district court concluded the Policies provided coverage for the repair or replacement of the defective windows and that Auto-Owners had breached its duty to defend Irby. The district court thus granted partial summary judgment in favor of Pozzi.

Pozzi and Auto-Owners then consented to the magistrate judge conducting the jury trial on the issues of damages under the Policies, bad faith, and punitive damages. Before the case was submitted for the jury's consideration, Auto-

6

Owners moved for a directed verdict concluding that there was no bad faith and that punitive damages were inappropriate. The magistrate judge reserved ruling on Auto-Owners' motion and submitted the case to the jury. The jury returned a verdict for Pozzi, found bad faith, and awarded $500,000 in punitive damages against Auto-Owners.

The jury also made the following findings in special interrogatories: (1) the settlement between Coral or Irby and Pozzi was not the product of collusion or fraud; (2) Pozzi and Coral and Irby acted reasonably and in good faith in settling the underlying lawsuit but the settlement in the amount of $646,726, as specified in the Consent Judgment in the underlying litigation, was not reasonable and in good faith, and $300,000 was a reasonable settlement amount; (3) Auto-Owners acted in bad faith in denying coverage for the cross-claims asserted by Pozzi against Coral and Irby in the underlying litigation and in breaching its duty to defend Irby; and (4) an award of $500,000 in punitive damages was warranted.

The magistrate judge entered final judgment in favor of Pozzi and awarded compensatory and punitive damages in the amounts specified by the jury. Auto-Owners then moved for judgment as a matter of law on three issues, arguing (1) that the evidence was insufficient to support an award of punitive damages, (2) that the evidence was insufficient to support the finding of bad faith, and (3) that, based

on the evidence at trial, the Policies did not provide coverage, and the district court had erred in awarding partial summary judgment in favor of Pozzi on the coverage issue. In the alternative, Auto-Owners sought a new trial on all issues.

The magistrate judge granted in part Auto-Owners' motion for judgment as a matter of law. Specifically, the magistrate judge concluded that the evidence was insufficient to support the jury's finding of bad faith or its award of punitive damages and set aside the jury's punitive-damages award. The magistrate judge also conditionally granted the motion for new trial on these issues, specifying that a new trial on bad faith and punitive damages should proceed in the event that its decision is reversed or vacated on appeal. The magistrate judge concluded that he was without authority to modify the district court's earlier grant of partial summary judgment as to coverage.

## II. DISCUSSION

### A. Auto-Owners' Coverage Appeal

On appeal, Auto-Owners argues that its Policies do not provide products-completed operations hazard ("PCOH") coverage for repair or replacement of defective work. Auto-Owners argues that under Florida law, comprehensive general liability ("CGL") policies, such as the Policies[2] here, cover bodily injury

---

[2]The Policies are form policies promulgated by the Insurance Services Offices ("ISO") and include standard language used in commercial general liability policies.

and property damage resulting from defective work, but not the repair or replacement of the work itself.

The district court rejected this argument, concluding that the Policies unambiguously provided PCOH coverage for repair or replacement of defective work by a subcontractor. We first describe the relevant policy language and then outline the Florida law.

### 1.      The Policies

The Policies provide coverage for sums that the insured Coral is legally obligated to pay as damages because of "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" and during the policy period. Specifically, the Policies state as follows:

1. Insuring Agreement.

> a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. . . .

. . .

> b.      This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
> (2) The "bodily injury" or "property damage" occurs

9

during the policy period.

The Policies also specifically provide for "Products-Completed Operations Hazard" coverage limited to $1 million. The Policies define "Products-completed operations hazard" as including all property damage "arising out of 'your product' or 'your work,'" as follows:

11.   a.   "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
(1) Products that are still in your physical possession; or
(2) Work that has not yet been completed or abandoned.

b.   "Your work" will be deemed completed at the earliest of the following times:
(1)  When all of the work called for in your contract has been completed.
(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

c.   This hazard does not include "bodily injury" or "property damage" arising out of:
(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

10

(2) The existence of tools, uninstalled equipment or abandoned or unused materials;
(3) Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

Pozzi claims that the defective windows here were completed work – in Perez's home, in which he resided – and that the damages arose out of that work and thus would fall within the PCOH coverage definition.

The Policies further define "your work" to mean "[w]ork or operations performed by you or on your behalf," (emphasis added) as follows:

15.  "Your work" means:
a.  Work or operations performed by you or on your behalf; and
b.  Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:
a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
b.  The providing of or failure to provide warnings or instructions.

(Emphasis added.)  Pozzi thus claims that the work performed by Coral's subcontractor Scott is also covered under the Policies.

The Policies also define "property damage" to mean:

a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b.  Loss of use of tangible property that is not physically injured.  All

11

such loss shall be deemed to occur at the time of the "occurrence" that caused it.

Thus, the main question is whether the "products-completed operations hazard" ("PCOH") coverage provided to Coral and Irby includes Coral and Irby's liability for the repair or replacement of defective work performed by Coral's subcontractor.

2.    Exclusions

The Policies also contain two relevant exclusions, as follows:

**2.    Exclusions**
This insurance does not apply to:

. . .

j.    "Property damage" to:

. . .

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

. . .

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

. . .

l.    "Property damage" to "your work" arising out of it or any part of it and including in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

First, exclusion (j)(6) provides that the insurance does not apply to property

12

damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." However, the Policies further provide that this exclusion "does not apply to 'property damage' included in the 'products-completed operations hazard.'" Thus, if the costs of repair or replacement are covered under the PCOH coverage, this exclusion does not affect coverage.

Second, exclusion (l) excludes "'[p]roperty damage' to 'your work' arising out of any part of it and including in the 'products-completed operations hazard.'" However, the Policies further provide that this exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Here, the damaged or defective work was performed on the insured Coral's behalf by the subcontractor Scott. Thus, this exclusion also is inapplicable.

Because none of the exclusions applies, the main question in this appeal remains, as stated earlier, whether the Policies' PCOH coverage includes Coral and Irby's liability for the cost of the repair or replacement of defective work performed by Coral's subcontractor.

### 3. LaMarche v. Shelby Mutual Insurance Co.

Viewing the language of the Policies in isolation, the district court's

13

conclusion that coverage exists arguably would seem to be proper. The Policies clearly cover PCOH property damage caused by occurrences in the coverage territory during the coverage period. Defective construction is an "occurrence" under Florida law, see State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1076 (Fla. 1998), and it is undisputed that the defective work here occurred in the coverage territory and during the coverage period. Thus, according to Pozzi, the costs of repair or replacement are covered under the PCOH provision because it is a sum the insureds Coral and Irby were legally obligated to pay as damages because of property damage (damaged, incorrectly installed windows) arising out of the subcontractor Scott's work.

However, the Florida Supreme Court in LaMarche v. Shelby Mutual Insurance Co., 390 So. 2d 325, 326 (Fla. 1980), concluded that CGL policies do not cover the costs of repair and replacement of defective work, but only cover any damage or injury resulting from the defective work. In LaMarche, the LaMarches entered into a building contract for the construction of their home. The general contractor's work proved to be deficient, and the LaMarches sought payment from the contractor's CGL insurance company for the replacement and repair of the defective work. The Florida Supreme Court concluded that the policy covered personal injury or property damage as a result of faulty work, but that no coverage

14

existed for the replacement and repair costs:

> To interpret the policy as providing coverage for construction deficiencies, as asserted by the petitioners and a minority of states, would enable a contractor to receive initial payment for the work from the homeowner, then receive subsequent payment from his insurance company to repair and correct deficiencies in his own work. We find this interpretation was not the intent of the contractor and the insurance company when they entered into the subject contract of insurance, and the language of the policy clearly excludes this type of coverage. Rather than coverage and payment for building flaws or deficiencies, the policy instead covers damage caused by those flaws.

LaMarche, 390 So. 2d at 326. The Florida Supreme Court then adopted the following reasoning of the Supreme Court of New Jersey in Weedo v. Stone-E-Brick, Inc., 405 A.2d 788 (N.J. 1979):

> An illustration of this fundamental point may serve to mark the boundaries between "business risks" and occurrences giving rise to insurable liability. When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case.

LaMarche, 390 So. 2d at 326-27 (quoting Weedo, 405 A.2d at 791-92) (quotation marks omitted).

The particular policy language and exclusions at issue in LaMarche were different from those at issue here. However, the broad language and reasoning of

15

LaMarche does not seem to be dependent on the precise terms of the policy. Rather, LaMarche indicates that CGL policies (as opposed to warranty policies, for instance) generally do not cover the costs of repair or replacement of defective work.

While the Florida Supreme Court has not reviewed the policy language here, the majority of Florida intermediate appellate courts have applied LaMarche broadly and concluded that CGL policies do not cover repair or replacement costs. See, e.g., Auto-Owners Ins. Co. v. Marvin Dev. Corp., 805 So. 2d 888, 892-93 (Fla. Dist. Ct. App. 2001) ("We also note that the Auto-Owners' insurance policies were not warranty policies providing coverage for construction deficiencies or defective workmanship. Comprehensive liability policies generally do not provide coverage to a contractor for deficiencies in its own work."); Auto Owners Ins. Co. v. Tripp Constr., Inc., 737 So. 2d 600, 601 (Fla. Dist. Ct. App. 1999) (CGL policies protect against only personal injury or property damage resulting from defective work, not for the repair of the work itself); Aetna Cas. & Sur. Co. of Am. v. Deluxe Sys., Inc., of Fla., 711 So. 2d 1293, 1296 (Fla. Dist. Ct. App. 1998) (quoting LaMarche, 390 So. 2d at 326, for the proposition that the "'purpose of . . . comprehensive liability insurance coverage is to provide protection for personal injury or for property damage caused by the completed product, but not for the

16

replacement and repair of that product"); <u>Lassiter Constr. Co. v. Am. States Ins. Co.</u>, 699 So. 2d 768, 769 n.1 (Fla. Dist. Ct. App. 1997) (same); <u>Home Owners Warranty Corp. v. Hanover Ins. Co.</u>, 683 So. 2d 527, 529 (Fla. Dist. Ct. App. 1996) (concluding, based on <u>LaMarche</u>, that the CGL policy, which was similar to the Policies here, did not provide coverage for repair or replacement of defective work, and rejecting argument that exclusion identical to exclusion (l) created such coverage); <u>Tucker Constr. Co. v. Michigan Mut. Ins. Co.</u>, 423 So.2d 525, 528 (Fla. Dist. Ct. App. 1982) (same); <u>see also</u> <u>Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.</u>, 227 F.Supp.2d 1248, 1262 (M.D. Fla. 2002) (applying Florida law to similar policy and concluding that, while the policy language was different from those in <u>LaMarche</u>, "Florida courts examining the same CGL policies . . . in this case continue to hold that CGL policies do not cover the costs to repair and/or replace defective construction" performed by subcontractors).

Most of the post-<u>LaMarche</u> cases are distinguishable in that the courts rested their decisions, at least in part, on specific policy language or factual circumstances that do not exist here. <u>See</u> <u>Marvin Dev. Co.</u>, 805 So. 2d at 891-92 (policy excluded PCOH coverage); <u>Deluxe Sys.</u>, 711 So. 2d at 1296-97 (claims fell within two different exclusions); <u>Lassiter</u>, 699 So. 2d at 770 (no coverage for repair or replacement of subcontractor's faulty work because claim fell within exclusion for

17

work on real property by the insured "or any other contractors or subcontractors working directly or indirectly on [the insured's] behalf"); Tucker, 423 So. 2d at 528-29 (claims fell within exclusion for property damage to work performed by the named insured). However, in each case cited above, the courts nevertheless went beyond the language of the particular policies in issue and reaffirmed the LaMarche holding that repair or replacement costs for defective work are not the type of costs covered by CGL policies generally. Further, at least one of those cases, the district court's decision in Travelers, 227 F.Supp. 2d at 1263, involves policy language identical to the Policies here and similar factual circumstances.

    4.    <u>Recent Split in Florida Courts</u>

Although the majority of Florida interim appellate courts have concluded CGL policies do not cover repair or replacement of the defective construction itself, in J.S.U.B., Inc. v. United States Fire Insurance Co., 906 So. 2d 303 (Fla. Dist. Ct. App. 2005), the Florida Court of Appeal, Second District, came to the opposite conclusion. In J.S.U.B., the claims at issue related to damage resulting from the subcontractor's faulty work in constructing houses, and the insurer argued that the damages were outside the scope of the CGL policies. The court acknowledged LaMarche and its progeny, but concluded that both the standard

18

CGL provisions and the controlling law had changed since LaMarche.[3]

The Florida court first noted that the policies contained broad insuring language covering property damage caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." J.S.U.B., 906 So. 2d at 308. "Accident" was undefined in the policies. Id. At the time LaMarche was decided, Florida law defined "accident," for insurance coverage purposes, to exclude "the natural and probable consequences of the insured's deliberate actions." Id. (citing Hardware Mut. Cas. Co. v. Gerrits, 65 So. 2d 69 (Fla. 1953)). But in State Farm Fire & Casualty Co. v. CTC Development Corp., 720 So. 2d 1072, 1076 (Fla. 1998), the Florida Supreme Court broadened the scope of insurance coverage, concluding that "an occurrence included not only an accidental event but also 'the unexpected injury or damage resulting from the insured's intentional acts. Thus, if the resulting damages are unintended, the resulting damage is accidental even though the original acts were intentional.'" J.S.U.B., 906 So. 2d at 308 (quoting CTC, 720 So. 2d at 1075) (other quotation marks and citation omitted). In CTC, the Florida Supreme Court concluded that a contractor's construction of a home in violation of setback requirements, where the contractor was under the mistaken belief that it

---

[3]The Policies here, and the policies in J.S.U.B., are standardized ISO policies that are identical in all material respects.

had obtained a variance, was an "occurrence" under the policy. CTC, 720 So. 2d at 1076. Based on this expanded definition of coverage events, the J.S.U.B. court concluded that LaMarche and its progeny no longer compelled the conclusion that CGL policies do not provide coverage for claims for repair or replacement of the subcontractor's faulty work. J.S.U.B., 906 So. 2d at 309.

The Florida court in J.S.U.B. also looked to the policies' exclusions to determine that coverage existed. The court acknowledged that, under Florida law, an exclusion cannot "create" coverage. However, the Florida court also recognized that "'[r]eading the coverage provision of the policy together with the exclusionary clause could support a conclusion that coverage is provided in the . . . policy for occurrences where the insured did not intend or expect to cause harm to the third party.'" Id. at 310 (quoting CTC, 720 So. 2d at 1075).

In J.S.U.B., the Florida court also addressed the same exclusions relevant here and found that they supported coverage of claims for repair or replacement of a subcontractor's faulty work. Specifically, the Florida court reasoned as follows:

> . . . Subparagraph 6 excludes coverage for restoration, repair, or replacement that is required because of work that was incorrectly performed. However, an exception to the exclusion is for "property damage" included in the "products-completed operations hazard." If we were to read the policies as suggested by the Insurer, without considering the import of the exclusions, it is arguable that this exclusion and exception to the exclusion would have no meaning or effect in this policy . . . .

20

Similarly, the "Damage To Your Work" exclusion contains an exception for work performed by a subcontractor on the Builder's behalf. The Insurer does not contend that the exclusion applies: instead, it simply reiterates its view that the policy simply provides no coverage for the Builder's claims. If the policies provide coverage, the exception to this exclusion would apply because the damage that occurred was the result of the subcontractors' use of poor soil and improper soil compaction and testing. Accordingly, based on our conclusion that the policies provide coverage, this exclusion does not apply because the exception to the exclusion applies.

Id. Thus, the Florida court concluded that LaMarche was inapplicable, that the policies provided coverage, and that none of the exclusions applied. Id. at 310-11. However, the Florida Supreme Court on April 5, 2006, accepted jurisdiction of the J.S.U.B. case and ordered briefing.

5.      Unsettled Question of Florida Law

The facts relevant to this appeal are basically undisputed and the parties agree that Florida law controls. Thus, the appeal turns on the purely legal question of the interpretation of the standard terms in CGL policies, such as the Policies in issue.

"Where there is doubt in the interpretation of state law, a federal court may certify the question to the state supreme court to avoid making unnecessary Erie guesses and to offer the state court the opportunity to interpret or change existing law." Tobin v. Michigan Mut. Ins. Co., 398 F.3d 1267, 1274 (11th Cir. 2005). As discussed above, there is dissension among Florida intermediate appellate courts,

21

as well as federal district courts, about the continued vitality of LaMarche and its applicability to standard CGL policies such as the Policies. Accordingly, because this appeal depends on resolution of a question of Florida law that will affect many other cases, we certify the issue to the Florida Supreme Court.

6.      Certification to the Florida Supreme Court

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF FLORIDA, PURSUANT TO ARTICLE V, SECTION 3(B)(6) OF THE FLORIDA CONSTITUTION.

TO THE SUPREME COURT OF FLORIDA AND ITS HONORABLE JUSTICES:

We certify the following question to the Supreme Court of Florida for determination under Florida law:

DOES A STANDARD FORM COMPREHENSIVE GENERAL LIABILITY POLICY WITH PRODUCT COMPLETED OPERATIONS HAZARD COVERAGE, SUCH AS THE POLICIES DESCRIBED HERE, ISSUED TO A GENERAL CONTRACTOR, COVER THE GENERAL CONTRACTOR'S LIABILITY TO A THIRD PARTY FOR THE COSTS OF REPAIR OR REPLACEMENT OF DEFECTIVE WORK BY ITS SUBCONTRACTOR?

22

The phrasing used in this certified question should not restrict the Supreme Court's consideration of the problem posed by this case. "This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers is given." Tobin, 398 F.3d at 1275 (quotation marks and citations omitted). To assist the Supreme Court's consideration of the case, the entire record, along with the briefs of the parties, shall be transmitted to the Supreme Court of Florida.

## B.    Pozzi's Cross-appeal

We now turn to Pozzi's claim on cross-appeal that the magistrate judge erred in granting judgment as a matter of law in favor of Auto-Owners as to the issues of bad faith and punitive damages.

The Florida Supreme Court has identified the following factors as relevant to a bad-faith determination: (1) "efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds"; (2) "the substance of the coverage dispute or the weight of legal authority on the coverage issue"; (3) "the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage"; and (4) "efforts made by the insurer to settle the liability claim in the face of the coverage dispute." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 63 (Fla. 1995). The parties

23

agree that these are the relevant factors.

In granting judgment as a matter of law in favor of Auto-Owners, the magistrate judge concluded that the evidence showed Auto-Owners' conduct was appropriate for an insurer that believed reasonably and in good faith that the claims were not covered:

> . . . The evidence shows that Auto-Owners denied coverage, defended the case under a reservation of rights, challenged coverage through the appropriate legal mechanism, and eventually was found to be wrong on the issue of coverage. Despite Pozzi's characterization of the evidence, it is clear that Auto-Owners did what insurance companies properly do when they have a serious doubt as to coverage: it defended under a reservation of rights, and sought declaratory relief on the question of coverage. There was no evidence of unreasonable conduct, no evidence of any independent tort, and no evidence that it exposed its insureds to excess judgments by its conduct. It did not mislead its insureds, and did not cause them any damages other than the amount of coverage provided by the policy.

The magistrate judge then concluded that each of the LaForet factors weighed in favor of Auto-Owners.

On appeal, Pozzi challenges the magistrate judge's application of the LaForet factors. After careful review of the record, we conclude that the magistrate judge did not err in applying the LaForet factors.[4] For example, as the

---

[4]We review de novo a district court's grant of a motion for judgment as a matter of law, applying the same standards as the district court. Transamerica Leasing, Inc., v. Institute of London Underwriters, 430 F.3d 1326, 1331 (11th Cir. 2005). "A district court may not grant a motion for a judgment as a matter of law unless 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Olmsted v. Taco

24

magistrate judge's order explained, the coverage issue was and is subject to serious debate; the evidence showed that Auto-Owners' denial of coverage was well-reasoned; there was no evidence that Auto-Owners misrepresented the terms of its Policies; Auto-Owners did not subject its insured to any damages beyond the denial of coverage; and the evidence was insufficient to support the jury's bad faith verdict. We conclude that Auto-Owners was entitled to judgment as a matter of law on the bad faith issue.[5]

Pozzi also argues that the same factors establishing bad faith warrant a punitive-damages award.[6] For the reasons set forth above and in the magistrate judge's order, we reject this argument and conclude that the magistrate judge properly granted Auto-Owners judgment as a matter of law.

### III. CONCLUSION

For the foregoing reasons, the magistrate judge's grant of judgment as a

---

Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (quotation marks and citations omitted).

[5]We recognize that Pozzi emphasizes the June 10, 2002, letter that Auto-Owners' coverage counsel sent to Klett regarding Irby's defense and argues that this letter illustrates Auto-Owners' bad faith. However, we conclude that the letter does not create an issue of material fact as to bad faith and punitive damages.

[6]Under Florida law, "the plaintiff must establish at trial, by clear and convincing evidence, its entitlement to an award of punitive damages." Fla. Stat. § 768.725 (emphasis added). Florida courts have clarified that for punitive damages to be awarded, "the conduct of the insurer against the interests of the insured must be so egregious as to constitute an independent tort." Dunn v. Nat'l Sec. Fire & Cas. Co., 631 So. 2d 1103, 1108 (Fla. Dist. Ct. App. 1993). Generally, dishonesty, misrepresentations, or fraudulent conduct must be alleged and proven. Id.

matter of law in favor of Auto-Owners as to the issues of bad faith and punitive

damages is affirmed.  As to the coverage issue, we certify the above question to the

Florida Supreme Court.

**AFFIRMED in part and QUESTION CERTIFIED.**