[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-13496

_____

AMERICAN BUILDERS INSURANCE COMPANY,

Plaintiff-Appellee,

*versus*

SOUTHERN-OWNERS INSURANCE COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:20-cv-81357-WM

_____

ON PETITION FOR REHEARING

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Southern-Owners Insurance Company's motion for panel rehearing is granted, and we vacate our previous opinion, published at 56 F.4th 938 (11th Cir. 2023), and substitute the following opinion in its place. In this opinion, we change section II.C in light of the Supreme Court's recent decision in *Dupree v. Younger*, 143 S. Ct. 1382 (2023). We make no further changes to the opinion, and our holding remains the same.

Ernest Guthrie fell from a roof and became paralyzed from the waist down, never to walk again. Within months, his medical bills climbed past $400,000, and future costs projected into the millions. Three insurance companies potentially provided coverage for Guthrie. This appeal is a battle between two of them.

The primary insurer for Guthrie's company was Southern-Owners Insurance Company. At the time of the accident, Guthrie was performing subcontracting work for Beck Construction, which had a policy with American Builders Insurance Company and an excess policy with Evanston Insurance Company. American Builders investigated the accident, assessed Beck Construction's liability, and evaluated Guthrie's claim. Southern-Owners, in contrast, did little to nothing for months. When push came to shove, Southern-Owners refused to pay any amount to Guthrie to settle the claim,

and American Builders and Evanston ponied up a million dollars apiece instead.

American Builders then sued Southern-Owners for common law bad faith under Florida's doctrine of equitable subrogation. Along the way, Southern-Owners moved for summary judgment, but the district court denied the motion. A federal trial jury heard the case and found in favor of American Builders. After the entry of final judgment, Southern-Owners sought judgment as a matter of law, or, in the alternative, a new trial. The district court denied those motions, too. On appeal, Southern-Owners challenges the denials of its summary judgment and post-trial motions.

After thorough review of the record and with the benefit of oral argument, we affirm.

## I.

## A.

Ernest Guthrie, an employee of Ernest Guthrie, LLC performing work for Beck Construction, slipped from the roof of a house on April 1, 2019, and crashed to the ground. He became paralyzed from the waist down. Guthrie's lawyer, Stuart Cohen, wrote to Beck Construction to assert the company's liability and request insurance information. Beck Construction, in turn, put its insurer, American Builders on notice on May 8. American Builders had issued a general liability policy to Beck Construction, with a limit of $1 million for each occurrence. American Builders' claim specialist investigated the incident by meeting with the company

and its outside investigator and collecting hospital records, rehabilitation facility records, and correspondences about the claim and injuries.

Cohen investigated his client's claim, too.  He determined that Beck Construction instructed Guthrie to climb onto the roof without providing any fall protection, while two spotters focused on their phones.  Guthrie had already sustained $400,000 in medical expenses, and Cohen calculated Guthrie's claim at $4 million to $5 million, even if Guthrie were partially liable.  On September 5, Cohen demanded that American Builders pay its $1 million policy limit within thirty days in exchange for a release of Beck Construction from liability.  American Builders requested an extension, and Cohen granted ten days, placing the deadline on October 14.

Cohen conditioned that demand on the lack of other available insurance.  But, as it turns out, there were two other relevant policies: Evanston provided an excess policy worth $1 million per occurrence to Beck Construction, and Southern-Owners -- which would become the defendant in the instant bad-faith case -- sold Ernest Guthrie, LLC a policy that covered $1 million.  Southern-Owners' policy contained an endorsement naming Beck Construction as an additional insured for any work Ernest Guthrie, LLC performed for Beck Construction, and making its policy the primary insurer for claims arising from Beck Construction's work.

During American Builders' investigation, it discovered these additional policies.  So, on September 12, it tendered the defense of and indemnity for Guthrie's claim to Southern-Owners.  In its

letter to Southern-Owners, American Builders attached the certificate of insurance listing Beck Construction as an additional insured on Ernest Guthrie, LLC's policy; the initial notice of the claim to American Builders; and Cohen's September 5 demand letter. A couple weeks later, on September 25, Southern-Owners' counsel sent letters to Cohen, American Builders, and Beck Construction, requesting additional incident reports, medical records, workers' compensation records, potentially applicable insurance policies, applicable construction contracts, and transcripts or recordings of statements by Guthrie and Beck Construction. She also asked Cohen for a forty-five-day extension on the September 5 demand.

Two days later, Cohen provided Southern-Owners with Guthrie's medical records and bills, American Builders' insurance policy, and correspondences from Cohen to American Builders in May and June that explained the accident. Cohen did not respond to the forty-five-day extension request, but, that same day, American Builders requested an extension for American Builders until November 4, which Cohen granted. In his letter granting the extension, Cohen explained that he recently became aware that Southern-Owners and Evanston might also provide coverage for the accident. Because of this new information, Guthrie would now only execute a release of American Builders that reserved his rights to pursue claims against either Evanston or Southern-Owners.

On October 10, American Builders retained counsel to address Cohen's new stipulation. Working quickly, the attorney concluded in a few days that Guthrie's claim was worth around $20

million to $30 million, far exceeding any applicable policy's coverage even if Beck Construction were largely not responsible. On October 14, he then informed Cohen that American Builders was prepared to pay its $1 million policy limit but that it could not accept Cohen's new stipulation because it provided only a partial release.

During the early weeks of October, the record does not reflect that Southern-Owners did anything, other than request extensions. But on October 18 -- over a month after receiving notice of Guthrie's injury -- Southern-Owners contacted the lawyer that American Builders had retained for Beck Construction to set up an interview with Russell Beck, the company's principal. Southern-Owners and the attorney spent the rest of October and all of November trying to set up a time to talk.

On November 25, still struggling to set up a meeting with Beck, Southern-Owners wrote Cohen, describing the setback and noting that it had no written documentation on the claim. Southern-Owners also requested until December 20 to respond to the September 5 demand letter. That same day, Southern-Owners told American Builders that it would agree to a defense of Beck Construction under a reservation of rights, but only after it spoke with someone from Beck Construction and completed its investigation. The letter noted that Southern-Owners' policy included an employer liability exclusion, which might bar coverage. American Builders passed along the contents of that letter to Beck Construction the same day. Also on November 25, Beck Construction's

lawyer offered November 26 or 27 for an interview with Beck, but Southern-Owners declined because this was not enough notice. He then proposed a telephone conference, but Southern-Owners demanded an in-person meeting.

Meanwhile, Cohen continued his attempts to secure payment for Guthrie. On November 18, he wrote to Evanston's claims manager, attaching the September 5 demand letter, the medical records, and other relevant documents, and made a new demand: a $2 million payout in exchange for a complete release of both American Builders and Evanston, with a decision due by December 18. American Builders received a copy of the November 18 demand letter two days later.

On December 10, nearly three months after it received notice of the claim, Southern-Owners finally met with Beck. Beck told Southern-Owners that Ernest Guthrie, LLC employed Guthrie; Guthrie was performing subcontracting work for Beck Construction; the other people on site were not responsible for spotting Guthrie; Guthrie did not request fall protection; and Guthrie admitted that he "f*cked up" and "stepped off the roof." Based on that conversation, Southern-Owners believed it had a strong liability defense. One week later, Southern-Owners decided it should talk with the other two workers present. At that time, Southern-Owners' counsel was "in the process of reaching out" to them.

Also on December 10, Evanston told American Builders' counsel -- who was no longer involved in the case -- that it planned to tender its full policy to Guthrie, even though it was not the

primary insurer.  After reactivating his file, counsel saw the November 18 demand letter.  With only eight days until that letter's deadline, he once again worked fast, reviewed the 2,700-page file, and concluded that American Builders should tender its policy limit to avoid a bad-faith claim.

On December 17, after internal discussions, American Builders decided to tender its limit.  It then called Cohen to request a one-day extension and discuss the Southern-Owners policy.  It learned that Guthrie did "not wish to pursue coverage under the [Southern-Owners] Policy and desire[d] to move forward with settlement without involving [Southern-Owners], directly."  American Builders' counsel's understanding was that Cohen and Guthrie simply wanted the payout and did not care where the money came from.

The next day, American Builders' counsel notified Southern-Owners of the November 18 demand letter.  Since Southern-Owners was listed as the primary insurer, counsel believed that Southern-Owners had a primary obligation to pay, so he reached out to give Southern-Owners a chance to step up before American Builders did.  Additionally, Southern-Owners' policy required an insured receive consent before accepting any settlement.  Counsel did not want American Builders -- standing in the shoes of Beck Construction -- to breach Southern-Owners' contract by tendering payment without consent.  Southern-Owners confirmed that it would not tender its coverage by the December 19 deadline.  American Builders' counsel then told Southern-Owners that American Builders

would be paying its policy limit.  Later that day, he wrote to Southern-Owners' counsel to confirm that American Builders was forced to pay the policy because Southern-Owners would not, and that American Builders would seek equitable subrogation against Southern-Owners.

American Builders paid the policy on December 19, and Guthrie provided a release for Beck Construction, American Builders, and Evanston the next day.  At that point, Southern-Owners -- having only conducted one interview with Beck -- ended its investigation.

## B.

American Builders sued Southern-Owners in Florida state court for common law bad faith under Florida's doctrine of equitable subrogation.  Southern-Owners removed the case to the United States District Court for the Southern District of Florida based on diversity jurisdiction.  Southern-Owners later moved for summary judgment, in part because it claimed its policy did not cover Guthrie's injury.  The district court denied the motion.

The parties then consented to the jurisdiction of a magistrate judge, who oversaw a three-day jury trial.  After the close of American Builders' evidence, Southern-Owners moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  Southern-Owners' only argument was that American Builders introduced no evidence that proved Guthrie attempted to settle with Southern-Owners.  The court denied the motion.  After the close

of all evidence, the jury returned a verdict in favor of American Builders, and the district court entered final judgment for $1,091,240.82. Southern-Owners then filed a renewed motion for judgment as a matter of law under Rule 50(b), or, in the alternative, a motion for a new trial under Rule 59. This time, Southern-Owners argued that it could not have settled Guthrie's demand, and that American Builders, standing in the insured's shoes, breached Southern-Owners' contract by failing to receive its consent before settling with Guthrie. The district court denied those motions.

This timely appeal followed.

## II.

"We review *de novo* the denial of a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, viewing the evidence in the light most favorable to the non-moving party." *St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, 5 F.4th 1235, 1242 (11th Cir. 2021). "We review a ruling on a motion for a new trial for abuse of discretion," giving deference to the district court "where a new trial is denied and the jury's verdict is left undisturbed." *McGinnis v. Am. Home Mortg. Serv., Inc.*, 817 F.3d 1241, 1255 (11th Cir. 2016) (citation and quotation marks omitted). "We review a district court's decision on summary judgment *de novo*," viewing the evidence and drawing all inferences in the light most favorable to the non-moving party. *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017).

## A.

The first and most significant issue in this appeal is whether American Builders proved a bad faith claim. Taking the evidence in the light most favorable to American Builders, a reasonable jury could have found (as it did) both that Southern-Owners acted in bad faith and that its bad faith caused American Builders to pay its policy. Moreover, American Builders did not breach Southern-Owners' contract and relieve Southern-Owners of its good-faith duties. The district court did not err in denying Southern-Owners' Rule 50(b) motion.

1.

Under controlling Florida law, "the critical inquiry in a bad faith [action] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018). Additionally, any "damages claimed by an insured in a bad faith case 'must be caused by the insurer's bad faith.'" *Id.* (citation omitted). That is, the bad faith conduct must "directly and in natural and continuous sequence produce[] or contribute[] substantially to producing such [damage], so that it can reasonably be said that, but for the bad faith conduct, the [damage] would not have occurred." *Id.* at 11 (quoting Fla. Std. Jury Instr. (Civ.) 404.6(a)).

The bad faith inquiry "is determined under the 'totality of the circumstances' standard," *id.* at 7, and we focus "not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured," *Berges v. Infinity Ins. Co.*, 896 So. 2d

665, 677 (Fla. 2004). That said, a claimant's actions -- such as a decision not to offer a settlement -- remain relevant in assessing bad faith. *See Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991); *Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1254 (11th Cir. 2021). Insurers have obligations "to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid [the] same," as well as to "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Bos. Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980). These "obligations . . . are not a mere checklist," however, and, as the Florida Supreme Court has explained, "[a]n insurer is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment." *Harvey*, 259 So. 3d at 7.

Moreover, insurance companies occasionally have an affirmative duty to offer settlements. "Bad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause." *Powell*, 584 So. 2d at 14. Thus, "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely," the insurer must "initiate settlement negotiations." *Id.* "In such a case, where '[t]he financial exposure to [the insured] [i]s a ticking financial time bomb' and '[s]uit c[an] be

filed at any time,' any 'delay in making an offer under the circumstances of this case even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith.'" *Harvey*, 259 So. 2d at 7 (alterations in original) (citation omitted).

At the end of trial, the district court properly and thoroughly instructed the jury on bad faith. The court charged the jury to consider "all of the circumstances" in determining whether the insurer "use[d] the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business," "investigate[d] the facts, . . . and "settle[d], if possible, where a reasonably prudent person faced with the prospect of paying the total recovery would do so." Moreover, the district court instructed the jury on causation, observing, among other things, that bad faith must "directly and in natural and continuous sequence produce[] or contribute[] substantially to producing" any damage, though it "need not be the only cause."

On this record, there was enough evidence to allow the jury to reasonably find that Southern-Owners acted in bad faith because it delayed acting on its duty to investigate and settle Guthrie's claim. American Builders notified Southern-Owners of the accident on September 12, and Cohen furnished the company with all relevant documents on September 27. Among those documents were proof of Guthrie's paraplegic status and medical bills already exceeding $400,000 and correspondences between Cohen and American Builders, laying out Cohen's theory of Beck

Construction's liability.  Right off the bat, Southern-Owners had little work left because the pertinent information landed in its lap. Those documents painted a picture of "injuries so serious that a judgment in excess of the policy limits [was] likely." *Powell*, 584 So. 2d at 14.  All that remained was a meeting with Beck, who could have helped inform Southern-Owners whether "liability [was] clear." *Id.*  Instead of meeting with Beck, though, Southern-Owners dawdled.  It did nothing for several weeks before finally reaching out to Beck Construction's lawyer.  Then, when Southern-Owners finally did speak with counsel, it delayed reasonable offers to interview Beck for nearly two months, turning down an in-person meeting for being last-minute and a phone interview for not being in person.  After finally meeting with Beck in early December, Southern-Owners decided it needed to follow up with the two other workers on site that day.  But it delayed again, providing no evidence that it reached out to them for at least another two weeks. As of December 18, Southern-Owners still had not contacted them -- even though Southern-Owners had requested until December 20 to respond to Cohen's September 5 demand.  With no time to spare, Southern-Owners was in essentially the same position it was in on September 27.

That body of evidence could lead a reasonable jury to conclude that Southern-Owners delayed its investigation instead of attempting "to resolve the coverage dispute promptly" or using "diligence and thoroughness." *Pozzi Window Co. v. Auto-Owners Ins.*, 446 F.3d 1178, 1188 (11th Cir. 2006) (quoting *State Farm Mut.*

*Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 63 (Fla. 1995)). And, in that delay, a jury could reasonably find that Southern-Owners completely neglected its "affirmative duty to initiate settlement negotiations," *Powell*, 584 So. 2d at 14, while Guthrie's hospital bills climbed due to his traumatic injury.

A reasonable jury could also find that Southern-Owners' bad faith caused American Builders' damages. *See Harvey*, 259 So. 3d at 7. When American Builders informed Southern-Owners of Cohen's November 18 demand, Southern-Owners refused to pay because it was still investigating the claims. Evanston had already tendered its $1 million policy on December 10, but the demand requested $2 million, so the next million needed to come from either Southern-Owners or American Builders. After Southern-Owners balked, American Builders had no choice but to tender payment. Southern-Owners' delay in investigating and settling led to its inability to tender an offer on December 18. As a result, a reasonable jury could find (as it did) that American Builders' damages stemmed directly and naturally from Southern-Owners' bad faith. *See id.* at 11.

In defense, Southern-Owners points the finger at Guthrie and Cohen. It focuses on their two settlement demands, neither of which named Southern-Owners, and on Cohen's statement that he and Guthrie had no interest in negotiating with Southern-Owners directly. However, "[t]he lack of a formal offer to settle does not preclude a finding of bad faith." *Powell*, 584 So. 2d at 14. Instead, under Florida law, it "is merely one factor to be considered." *Id.* A

jury could find that even though Guthrie and Cohen never made an offer to Southern-Owners, this did not wipe Southern-Owners' hands clean. What's more, Southern-Owners was left to explain why *its own* actions were not in bad faith, rather than focusing on just *the claimant's* actions. *Harvey*, 259 So. 3d at 7. Of course, "there's a difference between *focusing* on a claimant's actions, which would be improper, and *factoring* a claimant's actions into the totality of the circumstances analysis, which is not improper." *Pelaez*, 13 F.4th at 1254 (emphasis in original). In this case, though, Southern-Owners flipped Florida law on its head and exclusively focused on Guthrie and Cohen's actions.

**2.**

In the alternative, Southern-Owners argues that a reasonable jury should have found that it had no duty to act in good faith because American Builders breached Southern-Owners' contract by not receiving consent before settling the claim.[1] As we see it,

---

[1] Southern-Owners argued that a reasonable jury would have found in its favor on this affirmative defense for the first time in its Rule 50(b) motion. But "[d]istrict courts lack authority to grant a Rule 50(b) motion on a ground not previously raised in a Rule 50(a) motion prior to the submission of the case to the jury." *Johnston v. Borders*, 36 F.4th 1254, 1270 n.31 (11th Cir. 2022). American Builders, however, did not raise this lack of authority in district court and thus "fail[ed] to raise the inadequacy of [the] Rule 50(a) motion in response to [the] Rule 50(b) motion." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010). By not raising the argument in the trial court, American Builders "forfeited [its] right to raise waiver on appeal." *Id.* Moreover, none of the exceptions to forfeiture apply, and American Builders does

this affirmative defense fails, for two separate reasons. For starters, a reasonable jury could find that American Builders' failure to receive consent did not substantially prejudice Southern-Owners. What's more, a reasonable jury could also find that Southern-Owners did not act diligently or in good faith in attempting to obtain consent.

Southern-Owners' contract with Beck Construction provided that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." "[T]his language requires the insured to obtain the insurer's consent before settling." *Am. Reliance Ins. Co. v. Perez*, 712 So. 2d 1211, 1213 (Fla. 3d DCA 1998). That is, "while an insured is free to enter into a reasonable settlement when its insurer has wrongfully refused to provide it with a defense to a suit, . . . the insured is not similarly free to independently engage in such settlements where, as here, the insurer had not declined a defense to suit." *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So. 2d 475, 477 (Fla. 3d DCA 1997); *see also Am. Reliance Ins. Co.*, 712 So. 2d at 1212–13.

The Florida Supreme Court requires an insurer to establish three things in order to succeed on this affirmative defense: (1) a lack of consent; (2) substantial prejudice to the insurer; and (3) diligence and good faith by the insurer in attempting to receive

---

not argue otherwise. Thus, we consider this argument forfeited, and turn to the merits of the affirmative defense.

consent. *See Ramos v. Nw. Mut. Ins. Co.*, 336 So. 2d 71, 75 (Fla. 1976); *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co.*, 601 F.3d 1143, 1149–50 (11th Cir. 2010). The first element has a few exceptions. The insured may settle without obtaining consent if the insurer "wrongfully refused to provide [the insured] with a defense to a suit," *First Am. Tit. Ins. Co.*, 695 So. 2d at 477, or offers a conditional defense that the parties cannot agree upon, *Taylor v. Safeco Ins. Co.*, 361 So. 2d 743, 746 (Fla. 1st DCA 1978). Moreover, even if the insured was obliged to obtain consent, the failure to do so is not an affirmative defense unless the insurer also establishes substantial prejudice and evinces good faith in bringing about the cooperation of the insured. *Ramos*, 336 So. 2d at 75. As the Florida Supreme Court put it:

> This Court . . . emphasized that to constitute the breach of a policy, the lack of cooperation must be material and the insurance company must show that it was substantially prejudiced in the particular case by failure to cooperate. Furthermore, . . . the insurer must show that it has exercised diligence and good faith in bringing about the cooperation of its insured and must show that it has complied in good faith with the terms of the policy.

*Id.* (citations omitted).

We start with the first element: lack of consent. Over the objection of Southern-Owners, the district court instructed the jury to decide "whether American Builders Insurance Company

21-13496                    Opinion of the Court                    19

voluntarily made a payment without obtaining Southern-Owners Insurance Company's prior consent, or whether American Builders Insurance Company was legally obligated to make such payment." Both parties agree that American Builders never received consent before paying. Instead, they debate only whether American Builders needed to obtain consent because its payment was not "voluntary."

American Builders argued to the jury that its payment was involuntary because Southern-Owners unreasonably withheld consent and forced American Builders to either pay without consent or face a bad faith suit itself. The theory went this way: when Southern-Owners told American Builders that it would not tender payment, American Builders "involuntarily" paid "because of circumstances beyond [its] control," since the "situation requir[ed] immediate response to protect its legal interests." *See Rolyn Cos. v. R & J Sales of Tex., Inc.*, 412 F. App'x 252, 255 (11th Cir. 2011) (quotation marks and citation omitted). Southern-Owners responded that it could not have unreasonably withheld consent because American Builders had already decided to pay. The jury was told by Southern-Owners that American Builders made its decision voluntarily and before seeking any consent.

We need not settle whether American Builders made a voluntary payment under Florida law because Southern-Owners also bore the burden to prove two additional things -- substantial prejudice and good faith -- in order to sustain its affirmative defense,

and the jury could reasonably have found that Southern-Owners failed to prove either.

Turning first to prejudice, the district court instructed the jury that Southern-Owners "must establish that [American Builders'] breach of the consent provision was material and caused defendant to suffer substantial prejudice." *See Ramos*, 336 So. 2d at 75. Southern-Owners provided no evidence of substantial prejudice. In fact, its claim adjuster (John Blaser) unambiguously testified that he did not know *how* Southern-Owners was prejudiced by American Builders' decision to pay. When first asked whether Southern-Owners suffered any prejudice, the claim adjuster responded "maybe." And when asked if he had any facts of prejudice, he simply replied, "Not that I'm aware of at this time."

We are unpersuaded by Southern-Owners' claim that it has been prejudiced. For starters, Southern-Owners argues it was "blindsided" by American Builders' decision to pay on December 18 because it was not aware of Cohen's November 18 demand. This argument has several flaws. To begin, American Builders may have decided to pay before it called Southern-Owners, but it did not plan to tender payment until after learning whether Southern-Owners decided to pay instead. The evidence was sufficient to establish that American Builders' payment was contingent on Southern-Owners' decision. Moreover, this argument overlooks that, by the December 18 phone call with American Builders, Southern-Owners should have been ready to decide whether it would pay anyway because it had asked for an extension on its own

investigation until December 20.  Lastly, it ignores the company's long months of delay.  An insurer must have a reasonable time to investigate the claim, *see Bos. Old Colony*, 386 So. 2d at 785, but the evidence adduced at trial strongly suggested that Southern-Owners largely sat on its thumbs.

Southern-Owners also says that the $1,091,240.92 judgment entered by the district court turned Southern-Owners into a judgment debtor in an amount greater than its policy limits, resulting in substantial prejudice.  But Southern-Owners forfeited this argument by not raising it in district court.  *See Blue Martini Kendall, LLC v. Miami Dade County*, 816 F.3d 1343, 1349 (11th Cir. 2016).  Regardless, a post-trial judgment does not affect "the rights of the insurer in defense of the cause."  *Ramos*, 336 So. 2d at 75.  The judgment could not have affected Southern-Owners' defense because it came after Southern-Owners decided not to provide coverage.

Finally, as we have already detailed at length, a reasonable jury could (and did) plainly find that Southern-Owners did not "show that it [had] exercised diligence and good faith." *Id*.  American Builders did everything when it came to investigating Guthrie's claim and deciding whether the insured should make a payment, all while Southern-Owners sat back and watched.  The Florida Supreme Court has been clear on this point: without good faith, an insurer may not avail itself of an affirmative defense based on an insured's failure to cooperate.  *See id.*

The long and short of it is that, on this record, the evidence is not "so overwhelmingly in favor of [Southern-Owners] that a reasonable jury could not" have ruled for American Builders on bad faith and against Southern-Owners on breach of contract. *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). We see no error in the denial of Southern-Owners' Rule 50(b) motion.

## B.

Next up is Southern-Owners' claim that the district court abused its discretion in denying the motion for a new trial. Southern-Owners offers four reasons: (1) it did not act in bad faith because it was not offered an opportunity to settle; (2) any bad faith did not cause American Builders' damages; (3) American Builders breached its contract; and (4) generally, it did not act in bad faith.

All four of these arguments are retreads of the arguments for judgment as a matter of law that we have already rejected. The district court did not abuse its discretion in denying a new trial. For a new trial, Southern-Owners must show "the verdict '[was] against the clear weight of the evidence or . . . result[ed] in a miscarriage of justice.'" *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 948 (11th Cir. 2018) (citation omitted). As we've already explained in some detail, sufficient evidence existed for a rational jury to find that: (1) Southern-Owners delayed in its investigation and neglected to act on its affirmative duty to settle, *Powell*, 584 So. 2d at 14; (2) Southern-Owners' bad faith caused American Builders to suffer damages, *Harvey*, 259 So. 3d at 7, 11; and

(3) American Builders did not breach because Southern-Owners did not establish substantial prejudice or good faith, *Ramos*, 336 So. 2d at 75. The limited evidence favoring Southern-Owners -- its multiple requests for extensions of time and the details from the Beck interview -- does not amount to "the clear weight of the evidence." *Chmielewski*, 890 F.3d at 948 (citation omitted).

The jury's verdict was not against the clear weight of the evidence, and the district court did not abuse its discretion in denying Southern-Owners' Rule 59 motion.

## C.

The last issue we'll mention is whether the district court erred in denying Southern-Owners' summary judgment motion because its policy purportedly did not cover Guthrie's injuries. In the past, we would not have considered this argument at all because Southern-Owners did not re-raise it in its post-trial motions. *See, e.g.*, *Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1286 (11th Cir. 2001). A recent Supreme Court decision has made clear, however, that arguments denied at summary judgment are appealable after a trial on the merits if they raise "purely legal issues." *See Dupree*, 143 S. Ct. at 1389 (holding that "[w]hile factual issues addressed in summary-judgment denials are unreviewable on appeal, the same is not true of purely legal issues -- that is, issues that can be resolved without reference to any disputed facts"). Purely legal issues raised at the summary-judgment stage are "unaffected by future developments in the case," like the presentation of evidence at trial, so "there is no benefit to having a district court reexamine"

them after a trial.  *Id.*  Thus, following *Dupree*, purely legal issues need only appear in a pretrial Rule 56 motion for this Court to consider them, while fact-bound arguments still must be preserved in a Rule 50 motion at trial.  *Id.*

That said, we will not consider the district court's denial of summary judgment here.  At every step along the way, Southern-Owners has neglected to make its case that its policy exclusion defense is a purely legal issue.  And, needless to say, this is an argument that it should have squarely raised, especially since the distinction between a fact and legal question is "vexing," *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982), and it is up to the appellate courts to decide on what side of the line an issue falls, *see Dupree*, 143 S. Ct. at 1390–91.

As the record reflects, Southern-Owners first argued that a policy provision excluded coverage for the bodily injury that Guthrie suffered at the summary judgment stage in district court.  But in its memorandum in district court, Southern-Owners did not claim that this issue was purely legal.  Instead, it relied on facts to establish that "Guthrie was an employee of Ernest Guthrie, LLC, acting in the course and scope of his employment with Ernest Guthrie, LLC" and that "Ernest Guthrie, LLC is the Named Insured on the" policy.  In its response, American Builders disputed that the facts supported a finding that the exclusion precluded coverage, while also arguing that Florida precedent barred the defense as a matter of law.  After summary judgment was denied, the case went to trial, and, notably, Southern-Owners never re-raised the

argument in its post-trial motions for a judgment as a matter of law or for a new trial.  Because the issue potentially relied on facts in dispute at summary judgment, it was presumptively unappealable without being re-raised in district court in a Rule 50 motion.  *See Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (explaining that an order denying summary judgment after a full trial on the merits typically is not appealable because "the full record developed in court supersedes the record existing at the time of the summary-judgment motion").

On appeal, Southern-Owners raised the merits of the coverage defense, but it never offered any explanation for how the denial of the defense was appealable.  By failing to adequately explain in its opening brief what made its defense a purely legal one, the argument that it is appealable "is deemed abandoned and its merits will not be addressed." *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).  Moreover, Southern-Owners did not raise the argument in its reply brief -- although we have long recognized that raising it at that time would have been too late anyway. *See, e.g.*, *Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments . . . raised for the first time in the reply brief are deemed waived.").

Then, Southern-Owners appeared before this Court at oral argument, and, once again, it failed to proactively assert that its coverage defense was appealable.  Oral Argument at 0:16–13:53. Not until in its rebuttal argument did Southern-Owners maintain -- for the first time -- that its defense was a purely legal one. *Id.* at

24:50–27:45. And even then, it did so only after the panel pointed out that denials of summary judgment are usually not appealable after a merits trial. *Id.* at 24:33–24:50. In any event, it did not preserve the issue by waiting to raise it at oral argument. *Hernandez v. Plastipak Packaging, Inc.*, 15 F.4th 1321, 1330 (11th Cir. 2021) ("We do not consider arguments raised for the first time at oral argument.").

Finally, in its motion for rehearing, Southern-Owners offered a fully developed argument for why the denial of summary judgment was appealable in this Court. This last-gasp attempt, however, came far too late. *United States v. Pipkins*, 412 F.3d 1251, 1253 (11th Cir. 2005) (per curiam) ("We have a long-standing rule that we will not consider issues that were argued for the first time in a petition for rehearing.").

All told, Southern-Owners failed to make the case that we should hear this issue. Without a timely argument that the defense raised an appealable legal issue, we decline to reach the merits.

**AFFIRMED.**